THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT HEBEL, Defendant-Appellant.

Fifth District   No. 5—86—0248

Opinion filed August 23, 1988.

2

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

John R. Clemons, State's Attorney, of Murphysboro (Kenneth R. Boyle, Stephen E. Norris, and Matthew E. Franklin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

In a two-count indictment filed in the circuit court of Jackson County on April 2, 1985, defendant, Robert Hebel, was charged with aggravated criminal sexual assault and aggravated criminal sexual abuse in violation of sections 12—14(b)(1) and 12—16(c)(1) of the Criminal Code of 1961 (Ill. Rev. Stat., 1984 Supp., ch. 38, pars. 12—14(b)(1), 12—16(c)(1)). Following a bench trial, defendant was convicted of both charges, but was sentenced only on the assault. Defendant was sentenced to 15 years in the Department of Corrections and was ordered to pay a fine of $5,000, $150 restitution and costs.

Defendant raises six issues on appeal. He argues that: (1) the

search warrant used to obtain evidence against him was defective in that it was vague in scope, it was not supported by probable cause and it was preceded by an illegal arrest; (2) his conviction should be reversed because the only substantive evidence against him was a photograph; (3) the State failed to prove him guilty beyond a reasonable doubt; (4) the court erred in denying his motion for the payment of fees for expert witnesses; (5) one of his two convictions must be vacated because they were based on a single act; and (6) the court abused its discretion when it sentenced him to 15 years of incarceration and ordered him to pay a $5,000 fine and $150 restitution. Our resolution of these issues necessitates review of the evidence presented at defendant's suppression hearing, trial and sentencing hearing.

At defendant's suppression hearing, Kenneth Cannon testified that he is the owner of Flash Foto, a photo processing business in Carbondale, Illinois. On February 1, 1985, one of his employees asked him to look at some photographs that were being packaged and readied for pickup. The packaging bore defendant's name; however, Cannon did not know who had brought the pictures into the shop for processing. Cannon had previously instructed his employees that he was to decide whether sexually explicit or "lewd" photographs should be returned to customers. Cannon viewed the photographs and became concerned that the child in the photo was being sexually exploited or molested. Soon after Cannon viewed the pictures, Jack Womick came into Flash Foto. Womick, a friend of Cannon's, worked with an attorney, so Cannon asked Womick to look at the photos and advise him of his legal liability. After viewing the pictures, Womick agreed that the police should be contacted. Since Womick was en route to the police station, he told Cannon he would inform the police.

Shortly thereafter, Lieutenant Hill of the Carbondale police department arrived at Flash Foto and, after viewing the photographs, determined that some action should be taken. Hill called the State's Attorney's office, seeking a warrant. After Hill left, two plain clothes officers arrived. They remained there until defendant came in to pick up his photographs. The officers followed him out of the store when he left.

Defendant's son testified that he, his father, sister, and brother stopped at Flash Foto at approximately 4:30 p.m. on February 1, 1985. Defendant went inside. When he came out, he walked to the car and, as he started to open the door, two men walked up to him. They took the photographs defendant had in his hand, displayed badges, and closed the car door. Nothing was said prior to taking the photo-

graphs from defendant. After the police had talked to him, defendant got back in the car and said they had to follow the officers to the police station. When they arrived at the station, the children were escorted by the officers to a waiting room. Defendant's son next saw defendant as they were leaving the station at 9 p.m. that evening.

Defendant testified that on the morning of February 1, 1985, he took six rolls of color print film to Flash Foto to be developed. He was told he could pick them up after 4 p.m. He returned around 4:30 p.m. with his three children. He entered the photo shop, claimed his photographs, and walked back to his car. Upon reaching his car, defendant noticed two men approaching rapidly from the direction of the photo shop. Defendant said he had his hand on the car door, and the door partially opened, when the two men took the pictures from his hand, identified themselves as police officers, asked for identification, and closed the car door. Defendant produced his driver's license. He said the officers told him to follow them to the police station so that he could answer some questions for them.

When they reached the police station, defendant asked the officers how long it would take, and they replied, "[J]ust a few minutes." Defendant told his children they could stay in the car; however, the officers opened the door and told them to come inside. The officers told defendant that the children would be more comfortable in the police station.

Defendant said he was separated from his children for approximately four hours. He was escorted to a room and told to sit down and wait. When the officers returned, they told him he was not under arrest, but they were nonetheless going to read him his rights. After they read him his rights, defendant signed a paper indicating that he understood them. When the officers got up to leave, defendant asked if he could see his children. The officers said, "No, not yet." They left and did not return for 40 minutes to an hour.

When they came back they had his photographs. Defendant said the photographs were private, family pictures and they were not entitled to look at them. He told them he wanted to leave. The officers told him he could not leave until the State's Attorney arrived. Defendant then refused to answer some of their questions. Hill joined the other officers and told defendant that he had been interrogating defendant's children and his questions had brought at least one of them to tears. He told defendant he would ask them more questions if defendant did not cooperate.

When State's Attorney Clemons arrived, "several hours" after defendant had arrived at the station, he and another man again read

defendant his rights. They asked defendant his name and left. Sometime thereafter, defendant asked about leaving or seeing his children. According to defendant, Mr. Clemons responded, "In a little bit." Later, defendant again asked and Clemons said to be patient. Defendant protested that he had been patient, to which Clemons replied, "Don't push me, or I'll charge you right now."

Defendant's wife eventually arrived at the station and was allowed to see defendant. One of the officers asked if defendant would consent to a search of his home. Defendant asked to speak with an attorney and was allowed to telephone one. Shortly after defendant's attorney arrived, the police informed defendant and his attorney that a search warrant for defendant's home had been obtained. At 9 p.m. defendant was allowed to see his children.

The police escorted defendant to his house and searched it, confiscating and removing various items. They returned around 1 a.m., February 2, 1985, and placed defendant under arrest.

On cross-examination, defendant stated that the officers did not restrain him in any way until they returned to his house to arrest him. He did not tell them while outside the photo processing store that he did not want to go to the police station. While at the station, he told police he had a large quantity of photographs at his residence.

Defendant's wife testified that on February 1, 1985, she was to meet her family at the mall for dinner and a movie. When they did not meet her, she called her house, drove home, then drove to her husband's office. She was at the office, around 6:30 or 7 p.m., when she received a call from the police department informing her that her husband and children were at the station. An officer asked her to come to the station.

When she arrived at the station the police took her into a room and said they wanted to talk to her about some photographs her husband had picked up that evening. She was told the investigation concerned possible sexual abuse of her children. She asked about her husband and children, but the officers said they wanted to speak with her first. She was questioned for 10 or 15 minutes, during which time she asked to see her children and inquired as to the whereabouts of her husband. They told her that her husband was in another room. During the questioning, Mr. Clemons showed her some pictures and asked her how she felt about them.

She and her family left the police station between 9 and 10 p.m. They were escorted home by police officers who searched their home. The police returned later, in the early morning hours, and arrested defendant.

Larry Hill, a lieutenant with the Carbondale police department, testified that Jack Womick asked to speak with him at 3 p.m. on February 1, 1985. Womick said he had seen some pictures at a photo store and he thought the police ought to be aware of them.

Hill went to Flash Foto and spoke with the manager, Mr. Cannon, who showed him the photographs in People's group exhibit No. 1. Hill believed them to be lewd and illegal. Hill called the State's Attorney's office, explained what he had found, and asked for direction as to an appropriate course of action. After he called the State's Attorney's office, he again spoke with Cannon, who informed him that the person who brought the photographs in would probably be back to pick them up later in the day.

Hill returned to the police station and sent Detectives Goro and Barrett to the photo store to attempt to talk to the person who picked up the photographs. He told them to detain and question anyone who came to pick up the photos. Goro and Barrett departed for Flash Foto around 4 p.m. They returned shortly after 4:30 p.m. in the company of defendant and his children.

The children went into the lounge and Sergeant Moss stayed with them. Defendant accompanied Hill and other officers to an interview room. After defendant had been given his *Miranda* rights by Detective Barrett, Hill placed the pictures in People's group exhibit No. 1 before him and asked if the girl in the pictures was his daughter. Defendant replied affirmatively. Hill then asked defendant why he had taken the photographs. Defendant replied that he took pictures of everyone in his family. Defendant indicated that he was supposed to meet his wife, so the police attempted to locate her. Defendant did not ask to leave, he did not indicate that he did not want to speak to the officers, nor did he express concern for the safety of his children. The conversation was casual and defendant was cooperative. At one point during the interview, Detective Barrett told defendant that he was free to leave.

Later in the evening the State's Attorney and an assistant State's Attorney arrived at the station. Defendant was again advised of his *Miranda* rights before the State's Attorney talked to him. He was told he was not under arrest. In the course of the interview, defendant stated that he had pictures at home similar to those in People's group exhibit No. 1.

The police asked if they could look at the other photographs. Defendant said, "No, I think I better call an attorney." At that point defendant's wife arrived and he was allowed to talk to her. He was then allowed to call an attorney. At that point law enforcement per-

sonnel decided that they would try to get a search warrant.

Hill was the complainant. He took the unsigned warrant and the photographs to Judge Richman's home. The judge examined the photographs and the warrant, and signed the warrant. When Hill returned to the police station, defendant's attorney had either arrived, or arrived shortly thereafter. The police, the Hebels, and their attorney went to the Hebel residence, where the police executed the warrant. The police found thousands of photographs, many of which were devoid of evidentiary value, so they agreed with defendant and his attorney that they would take everything and return some of it later in order to expedite the search.

Robert Goro, a detective with the Carbondale police department, testified that on February 1, 1985, at approximately 3:30 p.m. he spoke with Hill, who instructed Goro and Barrett to go to Flash Foto, stop whomever came in to pick up the photos, and ask them if they would come to the station to discuss the pictures. When Goro and Barrett arrived at Flash Foto, they spoke with Kenneth Cannon, who showed them the photographs in People's group exhibit No. 1. The photographs depicted a young female in the nude. Goro and Barrett took up positions in the back of the store and waited for someone to claim the photographs.

Subsequently, Cannon advised them that defendant had picked up the photographs. Goro and Barrett exited the store and "verbally" stopped defendant as he was getting into his car. They identified themselves as police officers and asked defendant if he would come to the police station to talk about his photographs. He agreed. Barrett asked defendant if Barrett could hold the photographs and defendant gave them to him. Defendant followed the officers to the police station in his own car.

Detective Don Barrett of the Carbondale police department testified that he and Goro were dispatched to Flash Foto on the afternoon of February 1, 1985, to attempt to contact a person who had dropped off some photographs of a nude young girl. They spoke with Mr. Cannon, viewed the photographs which Barrett considered evidence of a crime, then waited in the back room of the shop.

About 4:30 p.m., Cannon informed them that someone had come into the shop, had picked up the photographs, and was leaving. Cannon described the man's clothing. The officers exited the store and saw a person wearing clothing as described preparing to enter a car in front of the shop.

They approached the man, identified themselves as police officers, and asked him for identification. They told him they needed to speak

with him about the photographs and asked if he would be willing to accompany them to the Carbondale police department. He agreed. Defendant was not told that he was under arrest or that he had to come to the station. He never indicated that he did not want to go. Barrett asked if he could hold a particular packet of photographs (previously marked with a star) while in transit to the police department. Defendant agreed to the request and gave Barrett the pictures. Defendant then followed them to the station.

When they arrived at the police station, Barrett suggested that defendant's children wait in the lounge and that Sergeant Moss take care of them while the officers and defendant talked. Defendant agreed. Defendant was read his rights and indicated that he understood them. He was told he was not under arrest. Lieutenant Hill showed defendant the photographs. After defendant acknowledged that he had taken them, the officers tried to ascertain the reason. Specifically, they were trying to find out whether there had been any sexual contact between defendant and the young girl in the photographs or any other young girls.

During the initial interview, defendant did not express a desire to leave the station or terminate the interview. He did not voice any complaints regarding his children. He was allowed to make several telephone calls. He tried unsuccessfully to contact his wife; however, Barrett was able to contact her around 6:30 p.m. at defendant's office. Barrett told defendant's wife not to worry, but a sensitive matter was being discussed with her husband. Barrett told her he thought she should come to the station to discuss the matter.

Upon her arrival at approximately 6:45 p.m., Barrett spoke with defendant's wife. She indicated that she knew defendant had taken photographs of their children, dressed and undressed. She was allowed to see her husband, and, according to Barrett, was at no time denied that opportunity.

Barrett was present when Hill asked the Hebels if they would consent to a search of their house. Defendant and his wife conferred for several minutes, then indicated that they wanted to talk to an attorney. After they had done so, Barrett was advised by Hill that the Hebels had decided not to consent and that a search warrant would be sought.

Shortly after the State's Attorney arrived at approximately 6:11 p.m., the State's Attorney and an assistant talked with defendant. They once again read him his rights and reminded him that he was not under arrest. Defendant told the State's Attorney that he had taken the photographs to show the development of his children. He

said he had similar photographs at his residence. Barrett did not hear the State's Attorney threaten defendant or tell him he could not leave.

Based upon the foregoing testimony, the court denied defendant's motion to suppress. The court found that the officers were justified in their belief that the photographs constituted evidence of a crime, that the officers acted reasonably when they waited for and stopped the person who claimed the photographs, that defendant had not been arrested when he drove to the police station, and that his statement to the police was voluntary.

At trial, Detective Barrett testified substantially as he had at the suppression hearing; however, his trial testimony was at odds with his prior testimony in one respect and provided some additional enlightenment in another area pertinent to the question of suppression. Barrett said he had "told" defendant that they "needed to speak to him" concerning some photographs that were among those that he had picked up. Barrett also indicated that he had possession of defendant's driver's license at the police station.

Detective Michael Osifcin of the Carbondale police department testified that he was at the Hebel residence on February 1, 1985, at approximately 9:30 p.m., to execute a search warrant. In the course of the search he found hundreds of slides, photographs, and negatives depicting children engaged in lewd exhibitions of genitals. Osifcin found the photographs in a crawl space beneath a closet in defendant's house. People's exhibits Nos. 1 through 15 were found in the crawl space.

The 10-year-old victim testified that she stayed with defendant's daughter one night in the summer of 1984. Defendant came to pick her up in the afternoon at her grandmother's trailer. When they arrived at defendant's residence, the victim played with defendant's daughter until defendant suggested that they go swimming. The girls changed in defendant's daughter's room. They were undressed when defendant came into the room with a Polaroid camera and said, "[W]ait, I want to get a picture of you." People's exhibits Nos. 1 through 4 are photographs defendant took of the girls at that point in time.

Before they left to go swimming defendant put suntan lotion on the girls. They subsequently went to an indoor pool at the Ramada Inn in Carbondale. The victim was not dressed when defendant applied the suntan lotion.

The victim stated that she did not remember defendant taking any pictures of her after she came back from the Ramada Inn. She

identified People's exhibits Nos. 5 and 6 as photographs of her sleeping in defendant's daughter's bed. She testified that she never again spent the night at the Hebel residence.

The victim's grandmother testified that defendant came to pick up her granddaughter on one occasion in the summer of 1984. She was to spend the night at a friend's house.

The victim's father testified that to his knowledge his daughter spent the night at the Hebels' residence only once in the summer of 1984. He stated that the victim has identifying moles, freckles, or brown spots on her right buttock and on her right thigh. He identified People's exhibits Nos. 5 and 6 as photographs of his daughter asleep in a bed, People's exhibits Nos. 12, 13, and 14, as photographs of her buttocks and vagina, and People's exhibit No. 15 as a photograph showing a hand opening her "vaginal cavity." Number 17 is an enlargement of No. 15.

The victim's stepmother testified that her stepdaughter spent the night at the Hebels in the summer of 1984, sometime between the last week of July and the middle of August. The witness stated that the victim has a mole on her right buttock and one on the back of her right thigh. She testified that People's exhibits Nos. 5 through 15 are photographs of the victim. People's exhibit No. 15 is a picture of an adult hand touching the victim's "vagina." People's exhibit No. 17 is an enlargement of exhibit No. 15. The victim's mother testified that her daughter spent the night at the Hebels' in late July or early August of 1984. She identified the photographs of her daughter nude.

Robert Lehr, a professor of anatomy, testified as an expert witness in the field of anatomy. Lehr testified that the components of the female sex organ include the mons pubis, labium majora, labium minora and the vagina. People's exhibits Nos. 15 and 17 show prepuberal female genitalia being spread apart by a hand. In the exhibits, the end of the thumb is touching the inner surface of the labium majora and the labium minora, whereas the index finger is touching the inner surface of the labium majora. The labium majora is the outer surface of the external genitalia; however, it extends to an inner surface of the genitalia, then to the labium minora, which in turn extends down into the vagina. The difference between the labium majora and labium minora is one of skin texture. The area being touched in the photographs performs only a sexual function.

Dr. Roger Klam, a specialist in obstetrics and gynecology, was accepted as an expert witness and testified that People's exhibits Nos. 15 and 17 depict a thumb and forefinger separating the female genitalia of a young girl. Klam estimated the girl to have been about nine-

years-old when the picture was taken. Klam considered the female genitalia to be the labium majora, labium minora, vagina, clitoris and some areas of the rectum. Klam said the thumb in the photographs is between the labium majora and the labium minora. He concluded that the finger is not touching the sex organ, but the thumb is.

William Brandon, a crime scene technician for the Carbondale police department, testified that he photographed defendant's hands on March 27, 1985. People's exhibit No. 27 contains the negatives. Exhibits Nos. 19A through K, 20A through K, and 21A through K are the photographs produced from those negatives. James Wentworth, a forensic scientist for the Department of State Police, testified that he photographed defendant's hands, and the negatives are contained in People's exhibit No. 28. People's exhibits Nos. 22A through L, 23A through L, and 24A through L are the prints from those negatives. Wentworth testified to his methods and the conditions under which the photographs were taken.

Gerald Richards, an FBI agent specializing in forensic photography, testified as an expert witness in the area of forensic photography. He testified that in April of 1985 he was sent known photographs and a questioned photograph of a hand and was asked to compare for similarities to see if he could positively identify the questioned hand as the known hand to the exclusion of all others. People's exhibits Nos. 15 and 17 are, respectively, the questioned photograph and an enlargement of that photograph. People's exhibits Nos. 27 and 28 are negatives of the known hand. People's exhibits Nos. 19A through K, 22A through L, 23A through L, and 24A through L are prints produced from the negatives.

Richards did a side-by-side comparison of People's exhibit No. 15 with known photographs, looking for folds or creases of the hand, scars, marks, and general characteristics. He found a number of fairly unique characteristics in common; however, he was "not able to positively identify both hands to the exclusion of all other people in the world." Richards did find numerous characteristic that "strongly suggest" the hands in the photographs are the same hand. He did not observe any differences that would suggest they are not the same hand. He said the hands in the photographs appear to be those of a male.

Ellis Kerley, a professor of physical anthropology with the University of Maryland, testified that he specializes in forensic anthropology and, after questioning by the attorneys, he was declared an expert in that field. He compared the questioned photographs with the known photographs and photocopied one of the known photographs to mark for comparative purposes. People's exhibit No. 26 is a marked photo-

copy of People's exhibit No. 22K illustrating points of comparison in red ink. Kerley found no points indicating dissimilarity. He found 22 points of similarity. In his opinion, the hand in People's exhibit No. 22K is the same hand depicted in People's exhibit No. 17. Kerley admitted it is "possible" that the hands in the known and questioned photographs are not the same hand.

The State rested its case. The defense, noting that the statute under which defendant was charged did not become effective until July 1, 1984, presented witnesses in an effort to prove that the victim stayed overnight at the Hebel residence in June of 1984, prior to the effective date of the statute.

The defendant's wife stated that she and her family stayed at the Holiday Inn South in Springfield on July 4, 1984. Defendant's exhibit No. 8E is a picture of her taken outside their room. She testified that, prior to the Springfield visit, on July 1, a photograph was taken of her and defendant with a cake. She identified defendant's exhibit No. 8F as that photograph. Ms. Hebel identified defendant's exhibit No. 1 as a photograph of her daughter and the victim in their swimsuits. She identified defendant's exhibit No. 10 as an enlargement of a collage of photographs wherein defendant's exhibit No. 1 appears. Ms. Hebel identified defendant's exhibit No. 11 as an uncut strip of photographs produced from consecutive negatives. Defendant's exhibit No. 11 contains, in order: photographs of a collage wherein exhibit No. 1 is depicted, exhibit No. 8F, and exhibit No. 8C.

Defendant's wife testified that the victim spent the night at their home in June of 1984. She could not recall having any other house guests that evening. She could not recall anyone coming to their home after her daughter and the victim went to bed.

Defendant's brother testified that he visited the Hebels around June 30, 1984, and stayed until July 1. Only family members were present during his visit. While at his brother's residence, he took a photograph of the Hebels with a cake. He identified defendant's exhibit No. 8F as that picture.

Sue Moroney, an office manager at the Holiday Inn South in Springfield, Illinois, testified that defendant's exhibit No. 3 is a registration card bearing Ms. Hebel's signature, a check-in date of July 4, 1984, and a check-out date of July 5, 1984.

Ed Delmastro, an instructor for Southern Illinois University's School of Technical Careers testified on defendant's behalf and was qualified as an expert witness in the field of photography. Delmastro testified that defendant's exhibit No. 9 is a 12-exposure roll of Kodak film. The photographs were taken in sequence from left to right.

Defendant's exhibit No. 11 is an uncut series of prints produced from the negatives of exhibit No. 9. Defendant's exhibits Nos. 8C and 8F appear to be prints from the negatives in exhibit No. 9. Defendant's exhibit No. 10 is an enlargement from a segment of defendant's exhibit No. 9. Defendant's exhibit No. 1 appears to be a Polaroid instant color print. Defendant's exhibit No. 10 appears to be a photograph of photographs, including defendant's exhibit No. 1. In the uncut strip of photographs, the photograph containing defendant's exhibit No. 1 precedes defendant's exhibits Nos. 8F and 8C.

In rebuttal, Debbie Pauline testified that she is acquainted with the Hebels and her daughter, Melisa, often played with defendant's daughter. Pauline said her children went to Wisconsin and stayed there from approximately July 27 to August 10, 1984. While they were gone, the victim's mother called her and told her that Ms. Hebel had invited the victim to spend the night. Pauline said she talked to the victim's mother three or four days after her children left for Wisconsin. Melisa and the victim went to visit with defendant's daughter on other occasions in the summer of 1984.

Based upon the foregoing evidence, the court found defendant guilty of both counts charged in the indictment. The court stated that there was "overwhelming" evidence presented that defendant's hand is depicted in People's exhibits Nos. 15 and 17 and that the victim's sex organ is depicted therein. In addition to the identification testimony, the court noted that there was strong circumstantial evidence to implicate defendant in the sexual assault. The victim testified that defendant took other photographs of her while she and his daughter were nude. He put suntan lotion on her, then took her to swim at an indoor pool. Defendant's wife said that no one came to their home that night after the children went to bed; only family members and the victim were present. Pictures of the victim were taken while she was in bed. An adult male hand is depicted in People's exhibits Nos. 15 and 17. Exhibit No. 15 was found in defendant's house.

At defendant's sentencing hearing, hundreds of slides and photographs found in a crawl space in his home were introduced as evidence in aggravation. They showed nude children and their genitalia. Some photographs had a penis superimposed over female genitalia. The slides and photographs had been cataloged using an A through E system, with A apparently being assigned to photographs depicting maximum exposure of genitalia.

Detective Lynn Trella testified that she had interviewed Ms. Hebel and had learned that the children in the photographs were patients, family friends, or playmates of the Hebel children. Of approxi-

mately 40 children depicted in the photographs, 17 were positively identified by name.

Mary Andrews, a family therapist, testified that she counselled the Hebels collectively and individually after defendant's arrest. Speaking of defendant's conduct she stated that "such an act will not occur in the future." On cross-examination, she admitted she could not with certainty predict the future. She said defendant had never acknowledged that his actions had harmed others. Andrews said that the absence of defendant would be a hardship to his children.

Defendant exercised his right of elocution. In his remarks, defendant emphasized the hardships he and his family had undergone due to the actions of the State, the court, and the public. Defendant addressed comments to the victim and her family, observing that his defense was conducted "in the least traumatic way possible" in an effort to minimize the hardship to her. Defendant stated, "I hope there is some recognition and appreciation for these attempts to make it easier on you ***." Later in his statement defendant stated that he "may have made some human errors in judgment." He, in essence, believed he had been sufficiently punished.

The court, in imposing sentence, noted that the victim had sustained no physical harm, although she had been traumatized due to defendant's actions. The court found defendant had not contemplated that his conduct would harm others, that there was no provocation for his actions, and that he apparently was not compensated for committing the crime. Although defendant had no prior history of criminality, and indeed could point to an exemplary record in military and civilian life, the court noted that defendant had a deep-seated obsession with the genitalia of young females, and a "long history *** of activity of a similar nature." Therefore, the court stated it was uncertain whether defendant's conduct was likely to recur. The court noted defendant's "self-pitying" statement. The court found that incarceration would be a hardship to his family and that defendant had used his position in the community, or more precisely, the "respectability" attendant to it, to facilitate the offense. The court sentenced defendant to 15 years in the Department of Corrections, fined him $5,000, and ordered him to pay $150 restitution and costs.

Defendant appeals from his conviction and sentence. He claims, *inter alia,* that the search warrant used to obtain evidence against him was defective in that it was vague in scope, it was not supported by probable cause, and it was preceded by an illegal arrest. We find that the search warrant was valid.

Defendant initially argues that there was no probable cause to be-

lieve the photographs in People's group exhibit No. 1 were "obscene." We believe the officers, and the court, had probable cause to believe the photographs in defendant's possession constituted evidence of "child pornography."

■ The version of the child pornography statute in effect on February 1, 1985, provided in pertinent part that

"(a) [a] person commits the offense of child pornography who:

(1) films, videotapes, photographs, or otherwise depicts or portrays by means of any similar visual medium or reproduction any child whom he knows or reasonably should know to be under the age of 16 where such child is:

\* \* \*

(vii) depicted or portrayed in any pose, posture or setting involving a lewd exhibition of the genitals of the child or other person; or

\* \* \*

(5) is a parent, legal guardian or other person having care or custody of a child under the age of 16 and who knowingly permits or arranges for such child to appear in any stage play, live performance, film, videotape, photograph or other similar visual presentation, portrayal or simulation of any act or activity described in subparagraphs (i) through (vii) of paragraph (1) of this subsection." Ill. Rev. Stat. 1983, ch. 38, pars. 11–20.1(a)(1)(vii), (a)(5).

Although the statute requires a "lewd" exhibition of genitals, the traditional obscenity standards set forth in *Miller v. California* (1973), 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607, do not apply to child pornography. Those standards, somewhat modified, had been incorporated in Illinois' 1981 child pornography statute. That statute defined child pornography as

"(1) [m]atter or a performance, whether live, cinematic or over broadcast media, of whatever nature, is 'child pornography' for purposes of this section if:

(A) it has as one of its participants or portrayed observers a child under the age of 16 or who appears as pre-pubescent; and

(B) it contains depictions or descriptions of sexual conduct which are patently offensive; and

(C) taken as a whole, the average person, applying contemporary standards of this State, would find it has as its dominant theme an appeal to prurient interest; and

(D) taken as a whole, it lacks serious literary, artistic, educational, political or scientific purpose or value." (Ill. Rev. Stat.

1981, ch. 38, pars. 11—20a(a)(1)(A) through (a)(1)(D).)

When, in 1982, the United States Supreme Court in *New York v. Ferber* (1982), 458 U.S. 747, 73 L. Ed. 2d 1113, 102 S. Ct. 3348, rejected *Miller's* obscenity standards as inapplicable in the context of child pornography, the Illinois legislature promptly acted, with *Ferber* in mind, to delete *Miller's* obscenity standards from the Illinois child pornography statute. See Debates of the House of Representatives, 83d Ill. Gen. Assem., House Proceedings, May 27, 1988, at 201-02.

In view of the legislature's action, *Ferber* standards are to be applied. *Ferber* modified the *Miller* formulation in child pornography cases by providing that a "trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole." (*Ferber*, 458 U.S. at 764-65, 73 L. Ed. 2d at 1127, 102 S. Ct. at 3358; see also *People v. Geever* (1988), 122 Ill. 2d 313, 522 N.E.2d 1200.) While it is clear that *Ferber* adopted a lesser standard than that enunciated in *Miller*, the *Ferber* standard is still not easily applied to a particular case.

Defendant, citing *People v. Gould* (1975), 60 Ill. 2d 159, 324 N.E.2d 412, and *People v. Lerch* (1985), 134 Ill. App. 3d 643, 480 N.E.2d 1253, argues that in order to constitute a "lewd exhibition of the genitals," the subject must be posed in "contrived" or "gymnastic" positions designed to reveal as much of the genitals as possible, or the focal point of the pictures must be the genital area. *Gould* and *Lerch* do provide some guidance in determining what is obscene; however, we do not believe that they define the perimeters of child pornography. Both cases deal with *Miller's* obscenity standards. *Gould* involved a prosecution on an obscenity charge; *Lerch* was a child pornography case, but the statute at issue incorporated the more demanding *Miller* standards.

The line between child pornography based upon "lewd exhibition" of genitals and acceptable nudity is difficult to draw; however, it is certainly not established by reference to *Lerch* and *Gould*. Moreover, the courts in those cases were concerned with evidence sufficient to support a conviction. That is not the focus of inquiry in the instant case.

Federal cases offer some guidance in this area. Federal statutes prohibit the making of visual depictions of minors engaging in lascivious exhibitions of genitals. (18 U.S.C. §§2251(a), 2256(2)(E) (1986).) The statutes are similar to our own and have been interpreted along guidelines set out in *Ferber*. In fact, the term "lewd" had been used

instead of "lascivious" in prior versions of the Federal statute, as it is currently used in our own. The two terms are generally considered interchangeable. (See *People v. Walcher* (1987), 162 Ill. App. 3d 455, 515 N.E.2d 319; *United States v. Dost* (S.D. Cal. 1986), 636 F. Supp. 828, *aff'd* (1987), 813 F.2d 1231.) We will therefore review Federal cases for whatever enlightenment they might provide.

■ Federal cases list the following factors as relevant in determining what constitutes a lascivious exhibition of a child's genitals: (1) whether the focal point of the visual depiction is of the child's genitalia or pubic area; (2) whether the visual setting is sexually suggestive, *i.e.*, in a place or pose generally associated with sexual activity; (3) whether the child is depicted in an unnatural pose or inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed or nude; (5) whether the visual depiction suggests coyness or willingness to engage in sexual activity; and (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer. (*United States v. Rubio* (5th Cir. 1987), 834 F.2d 442; *United States v. Dost* (S.D. Cal. 1986), 636 F. Supp. 828, *aff'd* (1987), 813 F.2d 1231.) As noted in *Rubio*, a visual depiction need not involve all of the foregoing factors to be a lascivious exhibition of genitals. That determination is to be made based upon the overall content of the visual depiction, taking into account the age of the minor. We believe the factors set forth in *Rubio* are helpful in determining what, beyond obscenity, may be considered child pornography, or more particularly, evidence sufficient to establish probable cause.

At this juncture a description of the 22 photographs seized from defendant is in order. Those photographs served as the basis for the search warrant in this case. We will first describe the photographs as a group. The pictures, without exception, focus only upon the nude female subject. The setting, other than certain photographs taken on or about a sofa and chair, is not a major factor in the pictures. In all but two of the photographs the girl's genitals or buttocks are visible. In most of the photographs the female is either standing on, sitting on, lying on, or draped across the sofa or the chair. Given the varying postures in the pictures, it can be assumed that she was told how to pose by the photographer. Some of the poses could be considered unnatural for a clothed person, and some could be considered sexually suggestive.

In eight of the photographs the girl's genitals are clearly visible. Of these, we find three photographs particularly significant. In the first photograph, the young girl is standing, facing the camera. She is smiling with her arms raised directly over her head in a seemingly un-

comfortable, stretching position. Her hips are thrust forward, and her legs are slightly apart so as to expose part of the interior of her genitalia. While the genital area may not be the focal point of the picture, that area is nonetheless a prominent part of the photograph. In the second photograph, the girl is sitting on the chair with her knees raised to shoulder level, her legs together, and her hands clasped around her shins. The exterior of her genitals is fully visible, albeit somewhat shadowed. Her head is tilted back and she is smiling. In the third photograph, the girl is lying on her side on the sofa. She is in a fetal position. The photograph is taken from her rear with her exposed genitals in the foreground. In this photograph her genitals, although not fully exposed, are the focal point of the picture.

■■ Taken as a group, or considering the three photographs in isolation, we believe a reasonable person would conclude that they are evidence of child pornography. Several of the criteria set forth in *Rubio* are present. The group of photographs all focus on the totally nude girl, and in particular, on her genitalia and buttocks. In one photograph, where only her buttocks are shown, she is literally draped across the arm of a sofa. Her face displays—although most likely unintentionally—as much sexual coyness as a girl her age could exhibit. The focal point of the three photographs previously discussed is, arguably, the girl's genitals. In at least one of the three photographs the child is in an unnatural, and seemingly uncomfortable, pose designed to reveal more of her genitals. In another photograph taken from her rear, the focal point is her exposed genital area. We believe the photographs are suggestive and designed to elicit a sexual response in a pedophile viewer, despite defendant's contention at trial that the photographs were taken merely to demonstrate his daughter's development. Her poses are inconsistent with that contention.

We acknowledge that the photographs at issue here are not as sexually revealing or offensive as those held to be in violation of the law in *Lerch*; however, as we have noted, *Lerch* dealt with a more stringent standard under prior law. Moreover, the court in *Lerch* was concerned with finding evidence sufficient to support a conviction; we are engaged in reviewing evidence to determine whether it furnishes probable cause of a crime.

We believe the facts of this case distinguish it from *People v. Biocic* (1967), 80 Ill. App. 2d 65, 224 N.E.2d 572, cited by defendant. The magazines at issue in *Biocic* were dedicated to depicting and expounding through photographs and articles the virtues of nudist living and to advancing nudism in our culture. They featured photographs of nudes engaged in normal activity or posed as a fully clothed person

would pose for a photograph. No attempt was made to be suggestive. People of all ages and sexes were depicted in the photographs. The court, applying obscenity standards, concluded, "It cannot be said that the magazines are totally without any socially redeeming characteristics." (*Biocic*, 80 Ill. App. 3d at 70, 224 N.E.2d at 575-76.) That standard, which seems to be the basis for the court's decision, is not applicable in our case.

We agree with the statement in *Biocic* that "[n]udity without lewdness is not obscene." (*Biocic*, 80 Ill. App. 2d at 70, 224 N.E.2d at 575.) Moreover, we will extend that proposition further and hold that nudity without lewdness is not "child pornography." We hold, however, that the photographs, taken as a group, are sexually suggestive exhibitions of genitalia and furnished probable cause to believe defendant violated the laws pertaining to child pornography.

It is, of course, highly unlikely that the police officers who seized the photographs, or the court that issued the search warrant, undertook such an extensive analysis, nor would we expect them to do so. They do not have the benefit of hindsight and reflection. They must often act quickly in appraising the data before them.

■ The officers did, however, review the child pornography statute prior to the viewing of the photographs. They felt that the photographs represented evidence of a crime. Prior to police involvement in the matter, three civilians viewed the photographs and apparently came to the same conclusion, as did a judge later that day. Probability, not *prima facie* showing of criminal activity, is the standard used in determining probable cause. (*People v. Malone* (1982), 106 Ill. App. 3d 575, 435 N.E.2d 917.) The test for probable cause is governed only by common sense and the practical considerations of everyday life. (*People v. Patroff* (1986), 141 Ill. App. 3d 483, 490 N.E.2d 148; *People v. Hobbs* (1978), 59 Ill. App. 3d 793, 375 N.E.2d 1367.) The probabilities at issue in a probable cause determination are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *People v. Gutknecht* (1984), 121 Ill. App. 3d 839, 460 N.E.2d 60.

■ Defendant argues that the stop of defendant outside Flash Foto was improper because there had been no prior determination by a judge that the photographs were obscene and the officers could not themselves determine probable cause existed because first amendment rights were implicated. Defendant relies primarily upon *Roaden v. Kentucky* (1973), 413 U.S. 496, 37 L. Ed. 2d 757, 93 S. Ct. 2796. *Roaden* is inapposite. In *Roaden*, a law enforcement officer seized, without a warrant, a film he and other officers believed to be obscene.

The film was being shown at a commercial theater with regularly scheduled performances. The Supreme Court held that a warrant should have been obtained and reversed defendant's conviction for exhibiting obscene material. In reaching its decision, however, the court acknowledged that "[w]here there are exigent circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime, it is reasonable to permit action without prior judicial evaluation." (*Roaden*, 413 U.S. at 505, 37 L. Ed. 2d at 765, 93 S. Ct. at 2802.) Although the court in *New York v. P. J. Video, Inc.* (1986), 475 U.S. 868, 89 L. Ed.2d 871, 106 S. Ct. 1610, employed sweeping language that seemed to indicate a retreat from the *Roaden* position, we feel confident that the *dicta* in *P. J. Video* would not reflect the court's position if it were confronted with facts such as those in this case. In the case before us, we do not believe that the officers were required to allow defendant to drive away with the photographs and to risk loss of the evidence.

Defendant claims that the officers could have obtained a warrant. He argues that there was an adequate interval of time between Lieutenant Hill's viewing of the photographs and the time defendant picked up his photographs. In support of his position, defendant contends that Flash Foto could have delayed notifying defendant that the photographs were ready. According to defendant's testimony, personnel at Flash Foto had already notified him that the photographs would be ready to pick up later in the day. Therefore, delaying notification was not an option. Moreover, a mere hour and a half elapsed from the time Hill viewed the pictures to the time the officers confronted defendant. Thus, the officers may not have had time to obtain a warrant. We note that Kenneth Cannon testified that Lieutenant Hill, upon viewing the photographs, called the State's Attorney's office and indicated that he was seeking a warrant. The record is otherwise silent as to what, if any, attempts were made to obtain a warrant; however, it is reasonable to infer that Hill sent Barrett and Goro to the shop to monitor the situation while he sought a warrant. In any event, we are unwilling to hold that an hour and a half is a sufficient time in which to obtain a warrant under the circumstances.

■■ ■ Defendant argues that, even assuming the officers were lawfully able to make a probable cause determination, they exceeded the scope of an investigatory stop and subjected defendant to the functional equivalent of an arrest. Although the trial court found to the contrary, and we find evidence in the record to support the court's finding, we will assume for the sake of argument that defendant was, in fact, under arrest when the officers detained him outside Flash

Foto. Given our finding that the photographs in People's group exhibit No. 1 constituted evidence of child pornography, our finding that the officers lacked sufficient time to obtain a judicial determination that the photographs reasonably could be construed to transgress the law, and our finding that the photographs and defendant's possession of them provided probable cause to arrest him, we see no point in examining the subtle differences between an investigatory stop and a full-blown arrest. Although the court ruled at the suppression hearing that defendant was not under arrest and that a valid investigatory stop had occurred, followed by defendant's consent to accompany the officers to the police station, we can affirm the court's denial of defendant's motion to suppress upon any alternative basis supported by the record. On review of a motion to suppress, the controlling question is the correctness of the lower court's conclusion, not the validity of its rationale. (*People v. Dyer* (1986), 141 Ill. App. 3d 326, 490 N.E.2d 237.) We do not mean to imply that the circuit court's reasoning was in error; however, neither do we feel compelled to conduct our own analysis along the same lines.

■■ ■ We have found that the police had probable cause to arrest defendant for violation of laws pertaining to child pornography. A police officer may make a warrantless arrest if he has probable cause to believe the person arrested is committing or had committed a crime. (*People v. Millender* (1986), 140 Ill. App. 3d 504, 488 N.E.2d 1105; Ill. Rev. Stat. 1987, ch. 38, par. 107—2(c).) Under such circumstances, a public arrest, as opposed to an arrest in a residence, is authorized even without any showing of exigent circumstances. (*United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820.) Since there was cause to arrest defendant, and since he was advised of his rights prior to his statement suggesting that he had other photographs at his home, defendant's statement was voluntary and was properly considered in issuing the search warrant for defendant's home.

■■ As for the officers' seizure of the photographs, assuming of course that they did in fact take them from defendant without his consent, we find that the plain view doctrine and exigent circumstances authorized their seizure. Where exigent circumstances are present, the plain view doctrine authorizes the seizure of illegal or evidentiary items visible to a police officer whose access to the object has some prior fourth amendment justification and who has probable cause to suspect that the item is connected with criminal activity. (*Texas v. Brown* (1983), 460 U.S. 730, 75 L. Ed. 2d 502, 103 S. Ct. 1535; *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 29 L. Ed. 2d

564, 91 S. Ct. 2022.) In this case, the officers were called to Flash Foto by Kenneth Cannon, the manager, to view the photographs in question. Where Cannon, who was not a law enforcement officer, allowed them to view the photographs developed from the negatives that had been given to him, no police intrusion requiring fourth amendment justification occurred. Defendant had no legitimate expectation of privacy in the photographs at that point in time, and the officers, while viewing them, were in a location where they had a right to be. If an inspection by the police does not intrude upon a legitimate expectation of privacy, there is no search for which a warrant would be required. (*Illinois v. Andreas* (1983), 463 U.S. 765, 77 L. Ed. 2d 1003, 103 S. Ct. 3319.) Moreover, no protected privacy interest remains after law enforcement officials have lawfully viewed that which is illegal. (*Andreas*, 463 U.S. at 771, 77 L. Ed. 2d at 1010, 103 S. Ct. at 3324; *People v. Uran* (1987), 157 Ill. App. 3d 294, 510 N.E.2d 610.) The officers, having lawfully viewed the photographs and having determined that they constituted evidence of child pornography, were entitled to seize them from defendant without further justification.

Defendant's final contention of error in the search and seizure area is that the warrant issued for the search of defendant's house was vague and overly broad in that it failed to particularly describe the things to be seized. It authorized the seizure of "photographs, slides, films, videotapes, or any mediums or reproductions that depict or portray any pose, posture, or setting involving a lewd exhibition of the genitals of any children reasonably believed to be under the age of sixteen years." Defendant claims the search warrant violated the warrant provisions of both the United States and Illinois Constitutions (U.S. Const. amend. IV; Ill. Const. 1970 art. I, §6), and allowed the police unfettered discretion in searching defendant's home and seizing items therein which they believed constituted a lewd exhibition of genitals.

In support of his position defendant cites, among other cases, *Marcus v. Property Search Warrant* (1961), 367 U.S. 717, 6 L. Ed. 2d 1127, 81 S. Ct. 1708, *United States v. Guarino* (1st Cir. 1984), 729 F.2d 864, and *People v. Gifford* (1975), 26 Ill. App. 3d 272, 325 N.E.2d 81. These cases hold that merely directing police to seize "obscene" material is insufficient specificity in a search warrant. Although the description used in this case—"a lewd exhibition of genitals of children reasonably believed to be under the age of sixteen"—is subject to interpretation as to the term "lewd," we believe the inclusion of "exhibition of genitals" gave the officers sufficient guidance and distinguishes this case from those cited by defend-

ant. Virtually identical phraseology was deemed sufficiently descriptive in *United States v. Wiegand* (9th Cir. 1987), 812 F.2d 1239 ("lascivious exhibition" of genitalia held sufficient). We believe the language used in the search warrant was sufficiently descriptive.

We turn now to contentions of error which defendant claims occurred immediately prior to or during his trial. We will first examine alleged trial errors, and then take up defendant's claim that the court erred in denying his motion for the payment of fees for expert witnesses.

Defendant contends that his conviction should be reversed because the only substantive evidence against him was a photograph. The photograph in question (People's exhibit No. 15) was found in a search of defendant's home. It shows a hand spreading apart a female's sex organ. The victim's parents identified her as the female in the photograph, based on identifying marks. Gerald Richards, an expert in forensic photography, and Ellis Kerley, an expert in forensic anthropology, compared the hand in People's exhibit No. 15 with known photographs of defendant's hand. Richards found numerous characteristics in common that "strongly suggest" the hands in the photographs are the same hand. He did not observe any differences that would suggest they are not the same hand. He stated that the hands in the photographs appear to be those of a male. Kerley found 22 points of similarity and in his opinion the hand in People's exhibit No. 17 (an enlargement of exhibit No. 15) is the same hand as the hand in known photographs of defendant's hand. The victim testified that she spent one night at defendant's house during the summer of 1984. She could not say whether defendant or anyone else touched her or photographed her while she was asleep.

Defendant argues that the photograph, depicting a hand spreading apart a female's sex organ, should not have been admitted as substantive evidence of the offense of aggravated criminal sexual assault. He contends that, under Illinois law, photographs are admissible only to corroborate, illustrate or impeach oral testimony. However, they are not, he claims, admissible as substantive, *i.e.*, probative, or real evidence. Defendant bases his argument, in part, upon assertions made in *Casson v. Nash* (1977), 54 Ill App. 3d 783, 370 N.E.2d 564, *aff'd in part and rev'd on other grounds* (1978), 74 Ill. 2d 164, 384 N.E.2d 365. In *Casson*, the court stated:

> "Photographs, when relevant and properly authenticated, are admissible for two distinct purposes: (1) to illustrate the testimony of a certain witness (see *Foster v. Bilbruck* (3d Dist. 1959), 20 Ill. App. 2d 173, 183, 155 N.E.2d 366, 372; 3 Wig-

more on Evidence §793 (3d ed. 1940)); and (2) to act as probative or real evidence of what the photograph depicts. (*People v. Bowley* (1963), 59 Cal. 2d 855, 859-61, 31 Cal. Rptr. 471, 474-75, 382 P.2d 591, 594-95.)" (*Casson*, 54 Ill. App. 3d at 795, 370 N.E.2d at 573.)

What the court stated with seeming certainty in the body of the opinion, it retracted in a footnote wherein it stated that photographs cannot be admitted as real evidence in Illinois, citing *Foster v. Bilbruck* (1959), 20 Ill. App. 2d 173, 155 N.E.2d 366. Thus, *Casson* appears to say that photographs can act as probative or real evidence generally, but not in Illinois. In *Missouri Portland Cement Co. v. United Cement, Lime, Gypsum & Allied Workers International Union* (1986), 145 Ill. App. 3d 1023, 496 N.E.2d 489, this court cited *Casson* for the proposition that photographs can act as probative or real evidence. (145 Ill. App. 3d at 1027, 496 N.E.2d at 491-92.) We did not then address the contradiction created by the *Casson* footnote; however, we now do so.

■■■ Other jurisdictions have allowed the use of photographs as substantive evidence, where probative of facts in issue. (See *State v. Goyet* (1957), 120 Vt. 12, 132 A.2d 623; *People v. Bowley* (1963), 59 Cal. 2d 855, 382 P.2d 591, 31 Cal. Rptr. 471; *Sisk v. State* (1964), 236 Md. 589, 204 A.2d 684; *Pacific Gas & Electric Co. v. Hacienda Mobile Home Park* (1975), 45 Cal. App. 3d 519, 119 Cal. Rptr. 559; *United States v. Stearns* (9th Cir. 1977), 550 F.2d 1167.) Moreover, modern legal scholars generally believe photographs should be accorded "substantive effect." (McCormick, Evidence §214, at 531 (2d ed. 1972); E. Cleary & M. Graham, Handbook of Illinois Evidence §401.8, at 128 (4th ed. 1984).) We see no reason to deny photographs substantive effect where an adequate foundation is laid establishing that the photograph actually depicts what it purports to represent.

A sufficient foundation is laid for a still photograph by testimony of any person with personal knowledge of the photographed object at a time relevant to the issues that the photograph is a fair and accurate representation of the object at the relevant time. (*Gaunt & Haynes, Inc. v. Moritz Corp.* (1985), 138 Ill. App. 3d 356, 485 N.E.2d 1123.) The witness need not know anything of the time or condition of the taking, but he must have personal knowledge of the scene or object in question and testify that it is correctly portrayed by the photograph. E. Cleary & M. Graham, Handbook of Illinois Evidence §401.8, at 125 (4th ed. 1984), citing *Kooyumjian v. Stevens* (1956), 10 Ill. App. 2d 378, 135 N.E.2d 146.

Two California cases, *People v. Doggett* (1948), 83 Cal. App. 2d

405, 188 P.2d 792, and the *Bowley* case previously cited, illustrate the substantive use of photographs under circumstances similar to the situation in the case at bar. *Doggett* involved criminal prosecutions for prohibited sexual acts wherein the photograph was the primary piece of evidence against the defendants. In *Doggett* a search warrant was executed for defendants' apartment and several boxes of photographs were found. Some of these photographs apparently showed defendants engaged in prohibited sexual conduct within their apartment. At trial, evidence was presented establishing the period of time during which the pictures were taken, the place where they were taken, and identifying the persons shown in the photographs as the defendants. An expert witness gave his opinion that the photographs were not composites or fakes. Defendants were convicted and appealed.

Defendants contended on appeal that the photographs were not sufficiently verified or authenticated to make them admissible into evidence and that without them the *corpus delicti* was not established and there was no evidence in the record showing that the offense was committed. It was argued that while the witnesses were able to identify the furniture and surroundings depicted in the pictures as being those in the apartment, and the people shown in the pictures as being the defendants, they were not able to, and did not, testify of their own knowledge that they had seen the offense committed, or that the pictures fairly represented things which were actually being done in the apartment at the time the photographs were taken. This is essentially defendant's position in the case at bar. The court in *Doggett* found the photographs admissible, holding the supporting foundation adequate.

The *Doggett* decision was later cited, with approval, by the California Supreme Court in *Bowley*. After discussing the *Doggett* case, the court held that photographs could in a proper case be admissible as probative evidence of what they show. The court stated:

> "There is no reason why a photograph or film, like an X-ray, may not, in a proper case, be probative in itself. To hold otherwise would illogically limit the use of a device whose memory is without question more accurate and reliable than that of a human witness. It would exclude from evidence the chance picture of a crowd which on close examination shows the commission of a crime that was not seen by the photographer at the time. It would exclude from evidence pictures taken with a telescopic lens. It would exclude from evidence pictures taken by a camera set to go off when a building's door is opened at night." (*Bowley,* 59 Cal. 2d at 861, 382 P.2d at 595, 31 Cal.

Rptr. at 475.)

We too see no reason to exclude evidence which is highly probative and without a doubt accurately depicts a hand in contact with a female sex organ. We find that the photograph was admissible as substantive evidence. We believe that the broad language employed in previous decisions in this State can be attributed to different factual situations. We agree with the State that the pronouncements in those cases are mere *dicta*. However, even if that were not true, we would take issue with their holdings.

In the case before us, the foundation laid by the State was adequate to support their admission. The victim testified that she spent the night at defendant's residence once in the summer of 1984. Although she was unaware that someone had taken pictures of her after she went to bed that night, she identified People's exhibit Nos. 5 and 6 as photographs of her sleeping in defendant's daughter's bed. We note that the sheets in People's exhibit Nos. 5 and 6, and in People's exhibit No. 15, the photograph in question, appear to be the same. The victim's parents testified that her genitals are depicted in People's exhibit No. 15. Her stepmother testified that she stayed at defendant's home overnight between the last week of July and the middle of August 1984. Two expert witnesses compared the hand in exhibit No. 15 to the hand in known photographs of defendant's hand. One expert, Gerald Richards, testified that numerous characteristics "strongly" suggest that the hand in the known photographs is the hand depicted in exhibit No. 15. Ellis Kerley also testified that in his opinion the hand in exhibit No. 15 is the same hand shown in the known photographs. William Brandon, a crime scene technician, and James Wentworth, a forensic scientist, testified that they provided the negatives for the known photographs of defendant's hand. We believe this testimony provides an adequate foundation for admission of People's exhibit No. 15, even though it might have been preferable to also provide expert testimony, as in *Doggett*, that the photograph was not a composite or fake. We find the absence of such testimony excusable in this case, because the photograph itself does not permit a claim that it is faked, nor did defendant advance such a claim. From the photograph it is apparent that the hand therein is actually in contact with the female's sex organ and is exerting pressure upon it to spread it apart. There is no possibility that the hand is superimposed over the sex organ. The photograph was properly admitted as substantive evidence.

Defendant next contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. We disagree. We believe

the evidence of defendant's guilt was overwhelming.

As we have previously noted, the victim's parents testified that her genitals are depicted in People's exhibit No. 15. Her stepmother testified that she stayed overnight at defendant's house between the last week of July and the middle of August 1984. The victim testified that she stayed overnight at defendant's house once, in the summer of 1984. While at defendant's house she and defendant's daughter were undressing in defendant's daughter's room, getting ready to change into their swimsuits, when defendant came into the room and took photographs of the nude girls with a Polaroid camera. Before they left to go swimming—at an indoor pool—defendant rubbed suntan lotion on the girls. The victim was unaware that any other pictures were taken of her later when she returned to defendant's house; however, she identified People's exhibit Nos. 5 and 6 as photographs of her sleeping in defendant's daughter's bed. The sheet in these exhibits appears to be the same one shown in People's exhibit No. 15, which was found, along with hundreds of other photographs of children's genitals, secreted away in a crawl space in defendant's home.

Expert witnesses examined People's exhibit No. 15 and known photographs of defendant's hand. Gerald Richards, an expert in forensic photography, believed the numerous characteristics in common strongly suggested that defendant's hand was depicted in People's exhibit No. 15. Richards found no dissimilarities to suggest otherwise. Ellis Kerley, a professor of physical anthropology, found 22 points of similarity, no points of dissimilarity. He concluded defendant's hand was shown in People's exhibit No. 17, an enlargement of People's exhibit No. 15.

Medical experts, Robert Lehr and Roger Klam, testified defining the components of the female sex organ. While they differed somewhat—as defendant notes in his brief—in defining the constituent parts of the female sex organ, they agreed that the features relevant to this case, the labium majora and labium minora, are component parts of the sex organ. Neither was allowed to give an opinion as to whether the photograph in question depicts an act of penetration of the sex organ; however, both concluded that the index finger and thumb of the hand in the picture was touching the labium majora and the labium minora. According to Lehr, the differences in these features of the female sex organ is a difference in skin texture.

■■ Based upon the foregoing evidence, we believe defendant was clearly proved guilty beyond a reasonable doubt. Expert testimony that defendant's hand is depicted in the relevant photographs is convincing. We see the similarities noted by the experts. Moreover,

when the strong circumstantial evidence is considered, proof that it is defendant's hand in the picture is overwhelming. The photograph was found hidden in defendant's house. Apparently, he was the only adult male that had access to the victim while she was asleep. He had taken photographs of the victim nude earlier in the day.

We also find the medical testimony more than convincing on the issue of penetration. The photograph in question clearly shows defendant's thumb on the inner surface of the labium majora and, as both experts testified, it is also touching a deeper area of differing skin texture called the labium minora. Even if only the inner surface of the labium majora were being touched, we would still agree that slight penetration had occurred. As Lehr testified, the female's sex organ is not in its normal position; it is being stretched out of position by the hand. If it were in its normal position, defendant's thumb would more clearly been seen to penetrate, touching the inner surface of the labium majora. The labium minora, however, is without a doubt internal when the genitalia is in its normal position. Evidence that defendant contacted this surface is conclusive evidence of penetration.

■■■ Defendant argues that the legislature intended by enactment of sections 12—12(f) and 12—14(b)(1) of the Criminal Code (Ill. Rev. Stat., 1984 Supp., ch. 38, pars. 12—12(f), 12—14(b)(1)) to prohibit only penetration of the vagina. Defendant notes that an earlier draft of the bill used the term "vagina," but "sex organ" was inserted in the final draft. He argues that the legislature meant "vagina" when it referred to "sex organ" in the statute. We find it difficult to believe that the legislature did not know the difference between "vagina" and "sex organ" where the definitions of these terms are available in any medical or scientific reference manual. We are unwilling to assume that the legislature said one thing, but meant another. Clearly, the legislature changed the terminology to the more inclusive "sex organ" for some reason. If we were dealing with an amendatory change in the wording of the statute, we would have to assume that the legislature meant to effect a change in the law as it theretofore existed. Courts should not assume that the legislature engaged in a useless act. (Board of Trustees v. Human Rights Comm'n (1981), 88 Ill. 2d 22, 429 N.E.2d 1207; People v. Nunn (1979), 77 Ill. 2d 243, 396 N.E.2d 27.) We deem it appropriate to apply that rationale to this change in terminology and conclude that the legislature meant to use the more inclusive term "sex organ."

The definition of the term "sex organ" is not generally disputed. A comprehensive scientific encyclopedia states that the external female organs of reproduction, i.e., sex organs, include, inter alia, the

mons pubis, labium majora, labium minora. This definition is consistent with the testimony of the expert witnesses in this case. The vagina is considered a deeper, internal structure. (Van Nostrand, Scientific Encyclopedia 1396-97 (6th ed. 1983).) The labium majora is defined as the "major lips" concealing most of the other external organs when a woman is in a normal standing position. It seems evident to us that these "lips" can be penetrated without penetrating the vagina. If the legislature meant for "sex organ" to mean vagina, it certainly took a simplistic view of the female anatomy. We believe the legislature meant "sex organ" to be more inclusive and that defendant was proved guilty beyond a reasonable doubt where the testimony indicated that he had touched the inner surface of the victim's labium majora and her labium minora.

Defendant next contends that the court erred in denying his motion for the payment of fees for expert witnesses. Although defendant's trial request was broader, defendant on appeal apparently is concerned only with the areas of hand analysis and anatomy. He claims, "[i]t is clear in the instant case that the testimony of expert witnesses in hand analysis and anatomy were [sic] vital to both the defendant's case and to the State's case."

The State contends that the defendant's motion was properly denied since he failed to establish the relevance of the expert's testimony, the expert's identity, and his or her proposed fees. Additionally, the State submits that defendant was not indigent and was not, therefore, entitled to payment of expert witness fees by the county. We reject the State's claim that defendant failed to adequately inform the court why he wanted the expert witnesses and what the relevance of their testimony would be.

Defendant's written motion requested payment from the county, for, *inter alia,*

> "[a] forensic scientist, with expertise in the area of hand comparison and identification, to examine a certain photograph which the State alleges is evidence of the commission of the crime of criminal sexual assault by the Defendant, Robert Hebel, in order to allow the Defendant, Robert Hebel, to refute or rebut the evidence of an expert for the State, who is an employee of the Federal Bureau of Investigation, whose evidence the Defendant believes will be presented at the trial of the *criminal sexual assault charge.*"

Defendant's written motion made no specific request for payment of an expert in the field of anatomy, although he did request therein payment to physicians to examine the victim to "render an opinion as to

her current physical condition."

At the motion hearing on February 19, 1986, one of defendant's attorneys, Mr. Strong, noting that the State had listed at least three physicians as possible witnesses, stated:

> "I think that it is only fair and correct that we also have a similar opportunity to have such experts. I guess I'm expanding a bit upon the request in the motion, Judge, but we would also need to have physicians to testify on Mr. Hebel's behalf in reference to the definition of such things as penetration, et cetera. Forensic scientists, they [the State] now have two of them, I think it is only fair we have one ourselves at least, paid for at county expense."

This statement by Mr. Strong was the only enlightenment counsel gave the court as to the need for expert witnesses in the two contested areas (hand comparison and anatomy), or the relevance of expert testimony in those areas, prior to the court's ruling.

In ruling upon the defendant's motion, the court stated:

> "[T]he law clearly provides that indigent or not indigent people are entitled to expert witnesses when such witnesses are needed; when the issues to be tried by the trier of fact require expertise. I'm sure that any of the matters that are—I don't know how the State's trying to try its case or the defense is trying the defendants' case relate [sic] to expert witnesses or the need for expert witnesses ***. I also find that under the rules there had been no indication of who an expert might be in this case ***."

The court then took under consideration defendant's motion for copies of certain photographs. In the course of arguments on that motion Mr. Strong again alluded to the defendant's need for expert witnesses to counter the testimony expected from the State's expert witnesses. The court again stated that it did not know what the evidence was going to be or why experts would be called "to describe what a photograph represents." Mr. Kimmel, another of defendant's attorneys, responded to the court's concerns more succinctly and intelligibly, and informed the court what the relevance of the expert's testimony would be:

> "There are three separate issues involving requirements for copies of the photographs. Relating first to the charge in CF—49, there are a certain number of photographs in that situation which have two relevant factors, first of which is the identification of a hand in one of the photographs which is what is my understanding Mr. Clemons plans on using the FBI and foren-

sic specialist for for [sic] an identification purpose. Obviously, Your Honor, the identification of that hand is relevant and is central to both the State's case and to our defense. That is why we needed an expert in forensics to be able to review copies of those pictures to determine what point of similarity and what points of difference there are between those photographs and other photographs that this Court had ordered in reference to my client's hands and in addition to my client's hands. Then there is the question *** of whether there is sufficient, under the statute, penetration. Now *** that is a question for this Court. It is a legal question. However, there is medical evidence in the discovery and additional discovery of another expert as of—we received it this morning—which [sic] go to definitions of anatomy. Again, Your Honor, we have to be able to show that picture to an expert to be able to let that person just view that from a standard of anatomy."

■■■ However inartfully accomplished, we believe defendant's attorneys apprised the court of defendant's need for expert witnesses and the relevance of their testimony, particularly in the hand comparison area. They did not, however, inform the court whom they wished to employ or how much the cost would be to the county. Even later at trial, where defendant's attorney at one point stated that he would have called expert witnesses had he had the time and money, when the court asked who counsel would have called, counsel could only vaguely refer to "people *** on the east coast in the New York or New Jersey area." We agree with the State that greater specificity should be required before writing defendant a blank check for expert witness fees. We hold that, at a minimum, defendant must be able to identify specific experts and give the court an estimate of the fees involved. Failure to do so warrants denial of defendant's request.

■■■ Moreover, defendant's indigence, a prerequisite to receipt of county assistance, was never established. He failed to establish that the $150,000 of liabilities he claimed were immediately due and owing, nor did he bother to include more than $100,000 in accounts receivable outstanding from his dental practice which he subsequently disclosed at sentencing. As the State notes, even assuming that the value of the accounts receivable may have been reduced because of the client's refusal to pay and collection costs, they still represent a major asset that defendant failed to disclose.

■■■ We also note that defendant failed to avail himself of less expensive alternatives that could have served his purposes. For example, as observed in *People v. Watson* (1966), 36 Ill. 2d 228, 221 N.E.2d

645, he could have simply subpoenaed experts to testify at trial. The witnesses subpoenaed could have been asked to compare the hands in the pertinent photographs, or give their definitions of sex organ and their opinions as to what areas of the female's sex organ the hand was touching in the photograph. We do not believe extensive preparatory work would have been required.

In any event, even assuming *arguendo* that defendant should have been allotted money for expert witnesses and that denying him said money denied him some constitutional right as he claims, he was not prejudiced by that denial. The standard of review for an error which affects a defendant's constitutional right to a fair trial is whether the error was harmless beyond a reasonable doubt, that is, whether there is a reasonable possibility that the error might have contributed to the accused's conviction. (*People v. Merideth* (1987), 152 Ill. App. 3d 305, 503 N.E.2d 1132.) It is the duty of a reviewing court to consider the trial record as a whole and to ignore errors, including constitutional violations, that are harmless beyond a reasonable doubt. (*United States v. Hastings* (1983), 461 U.S. 499, 76 L. Ed. 2d 96, 103 S. Ct. 1974.) Given the convincing evidence of defendant's guilt, we find this alleged error—if error at all—harmless.

Defendant further contends that one of his two convictions must be vacated since they both stem from a single act, that depicted in People's exhibit No. 15. The State concedes that convictions for both aggravated criminal sexual assault and aggravated criminal sexual abuse cannot stand. Indeed, prejudice results to a defendant in those instances where more than one offense is carved from the same act. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) Since we have upheld defendant's conviction for the greater offense of aggravated criminal sexual assault, we will, as the State requests and the case law directs, vacate the lesser offense of aggravated criminal sexual abuse. See *People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.

Defendant's final contentions of error concern his sentence. Specifically, defendant claims the sentence "was an abuse of discretion since there was no determination of defendant's ability to pay the fine or the restitution, the court relied on improper aggravating factors, and the sentence did not reflect defendant's rehabilitative potential."

As we have previously noted, defendant stated at sentencing that he had more than $100,000 in accounts receivable outstanding from his dental practice. He also claimed $150,000 in outstanding debts; however, there is no indication in the record that these debts were immediately due *in toto*. As for defendant's fine, we believe that the record supports a finding that defendant will have the future abil-

ity to pay the $5,000 fine imposed upon him. A specific finding of an ability to pay is not necessary before a fine is warranted, as such a finding is implicit in the imposition of the fine where the trial court is aware of facts that support its determination. (*People v. Ivy* (1985), 133 Ill. App. 3d 647, 479 N.E.2d 399.) Moreover, since the order sentencing defendant and imposing the fine does not provide for the time or method of payment, the question of defendant's ability to pay at the time of sentencing is, on this record, irrelevant. We need not anticipate problems that may not arise and for which a statutory solution is provided. (See *People v. Maldonado* (1985), 109 Ill. 2d 319, 325, 487 N.E.2d 610, 613.) As noted in *Maldonado*, section 5—9—3(c) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—9—3(c)) allows the circuit court to enter an order allowing an offender additional time for payment, reducing the amount of the fine, or revoking the fine or the unpaid portion thereof. Even assuming a reduction in the $100,000 accounts receivable for collection costs, defendant could still collect a substantial sum of money with which he could pay a $5,000 fine. We see no error in the imposition of the fine.

█ As for the $150 restitution, defendant's counsel specifically stated at defendant's sentencing hearing, "I certainly don't have any objection to the $150.00." We believe this issue has been waived. Defendant agreed to pay restitution. (See *People v. Wilson* (1980), 87 Ill. App. 3d 544, 408 N.E.2d 1209; *People v. White* (1985), 135 Ill. App. 3d 563, 482 N.E.2d 134.) In any event, the $100,000 of accounts receivable from defendant's dental practice represents a substantial untapped asset which could be used to pay restitution in the future.

█ Finally, defendant claims that his sentence is excessive and is the result of the court's consideration of an improper aggravating factor and failure to properly assess defendant's rehabilitative potential. Although we do not believe that defendant's 15-year prison sentence is improper under the circumstances, we do find that the circuit court relied upon an improper aggravating factor when it sentenced defendant.

The court found that defendant used "his professional and civic position to get, little girls *** to his place and take pictures of them." A sentencing court can consider that "the defendant utilized his professional reputation or position in the community to commit the offense, or to afford him an easier means of committing it" (Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2(a)(6)); however, there is absolutely no evidence in the record to indicate that the victim's parents allowed the victim to spend the night with defendant's daughter only

because her father was a dentist and a respected member of the community. Defendant's daughter and the victim were playmates. That is why she spent the night. Our research has revealed no case that would allow this aggravating factor to be applied in this situation.

We also note that defendant was being sentenced only for the offense against the victim, not for the photographs he took of other young girls. His conduct in relation to those other girls is certainly something the court could consider in sentencing defendant; however, even if defendant had used his professional reputation or position in the community to facilitate the commission of *those* offenses, that fact could not be considered in *this* case as an aggravating factor.

Although the court did refer, in passing, to the improper aggravating factor, it is clear from the record that the weight placed on the improper factor was so insignificant that it did not result in a greater sentence; therefore, remandment is not required. (See *People v. Bourke* (1983), 96 Ill. 2d 327, 332, 449 N.E.2d 1338, 1340; *People v. Joy* (1986), 150 Ill. App. 3d 310, 501 N.E.2d 1325.) The court's comments demonstrate an overriding concern for defendant's deep-seated obsession with the genitalia of young girls and his long history of misconduct as evidenced by the hundreds of photographs he had taken over the years. The court expressed doubts that defendant could or would change, and noted defendant's "self-pitying" statements at sentencing wherein defendant actually addressed remarks to the victim and her family, informing them that they should be grateful to him for not traumatizing the victim during cross-examination. The court stated:

> "[T]here are a lot of things Robert Hebel doesn't realize. *** I don't think that we can tell that Mr. Hebel won't in the future if not properly punished commit future activities."

The court's comments indicate that the court believed defendant was not likely to change his behavior and that he generally lacked rehabilitative potential. That lack of rehabilitative potential, not the improper aggravating factor, was the basis for defendant's 15-year sentence.

For the foregoing reasons, we affirm defendant's conviction and sentence for aggravated criminal sexual assault; we vacate his conviction for aggravated criminal sexual abuse.

Affirmed in part; vacated in part.

HARRISON, P.J., and CALVO, J., concur.