THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
STEVEN POTTS, Defendant-Appellant.

Second District   No. 2—90—0526

Opinion filed February 10, 1992.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, Daniel D. Yuhas, of State Appellate Defender's Office, of Springfield, and Joseph Michael Williams, of St. Charles, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, Steven Potts, was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)) in a jury trial. The trial court subsequently denied defendant's post-trial motion

and sentenced him to nine years' imprisonment. This timely appeal followed.

Defendant raises six issues: (1) whether defendant was proved guilty beyond a reasonable doubt; (2) whether defendant was denied a fair trial due to juror misconduct; (3) whether the trial court correctly refused to tender defendant's battery instructions; (4) whether the prosecutor's closing argument denied defendant a fair trial; (5) whether the trial court properly allowed Dawn Davis to testify as to complainant's spontaneous declaration; and (6) whether defendant's sentence is excessive.

First, we address defendant's argument that he was not proved guilty beyond a reasonable doubt. The following facts are relevant to this issue.

Complainant testified for the State that on February 25, 1986, she was 16 years old. At that time, she had known defendant "on and off" for over a year. They had had sex on two or three occasions. On the date in question, complainant picked up defendant at his Aurora home and drove to the home of David Williams in North Aurora. Williams was a friend of defendant. At various times in the evening, complainant asked defendant to give her the car keys so that she could leave. Defendant refused to do so. During the course of the evening, complainant and defendant drank an unspecified amount of alcoholic beverages.

At one point, complainant thought of going to a neighbor's house and calling the police for assistance in getting the car keys. Eventually, complainant went outside, and defendant followed her. He told her to get back into the house. During this exchange, defendant pushed complainant against the car but did not hit her. She was afraid of defendant and, consequently, returned to the house.

About 20 minutes later, complainant drove defendant back to his house. Upon arriving, defendant took the keys from the ignition, so complainant had to follow him to the house. Defendant's half brother, Chuck Feltman, let them into the house. Complainant followed defendant into the dining room, where defendant ignored her efforts to get the keys back. Complainant did not recall whether defendant forced her downstairs to his bedroom. Defendant told complainant that she had embarrassed him at the party and that he was going to "fuck her up." Defendant hit her face several times. She was also bruised on her arm and scratched "all over [her] body." Defendant told her to take off her clothing, which she did out of fear.

Defendant attempted vaginal sex with complainant, who was having her period. He next attempted anal intercourse unsuccessfully.

Throughout this, complainant was crying hysterically. Finally, defendant forced complainant to engage in oral sex; he then ejaculated on her chest and clothing. Defendant allowed complainant to dress and leave his house.

Complainant drove away in a hysterical condition. She went to the home of a friend who was not home. She called another friend, Dawn Davis. Davis later took her to the police department.

On cross-examination, complainant did not recall if she had anything to drink at the party. She admitted getting into a fight with a Hispanic male named "Rick." Complainant kicked Rick in the groin. She did not remember if Rick struck her. After this altercation, defendant angrily took her out of the house and pushed her up against the car. Further, when she was at defendant's house, complainant did not ask Chuck Feltman's help in retrieving the car keys. Complainant stated that defendant forced her "a little to go down into his bedroom." She denied ever having been in defendant's basement room before the alleged occurrence. Complainant further denied that her mother forced her into pressing charges against defendant.

On redirect examination, complainant did not recall what happened in her fight with Rick but did remember that he damaged some of her jewelry.

Dawn Davis testified that she was a friend of complainant. On February 25, 1986, at about 11 p.m., she received a call from complainant, who was crying hysterically. Complainant said on the phone that she had been raped. Davis told her to come to her house. Complainant arrived about 15 minutes later; she was still in a hysterical condition. Davis noticed two bruises on complainant's face and a scratch on her chest. Davis said that she had been beaten up and raped by defendant at his house. Complainant told Davis that defendant's brother and another man were at defendant's house during the assault but did not help her. Davis accompanied complainant to the police station, where she later began to calm down.

Officer Robin Trettenero testified that at approximately 1:30 a.m. on February 26, 1986, he met with complainant at the Aurora police department. Complainant's face was very swollen. She had contusions near her left and right eyes and scratches on her neck and chest. Complainant was emotionally distraught and crying. Officer Trettenero took complainant to Mercy Center Hospital for a standard rape assessment.

There was stipulated testimony from Officers Lawrence and Davis as to their taking complainant's clothing and a rape kit to the Joliet crime lab in a sealed condition. There was also stipulated testimony of

crime lab scientist, Judy Welsh, who would testify she received these items and detected seminal material on complainant's clothing, but no seminal material was found in vaginal, anal or oral swabs taken from the rape kit. Due to the small amount of seminal material, there was no ability to compare it to a known source. Nor could she determine the time or date when the seminal material was deposited on the clothes.

Dr. Alberts and Linda Selvidge, Mercy Center Hospital emergency room physician and nurse, respectively, would testify that they saw complainant at Mercy Center Hospital emergency room on February 26, 1986. Both saw numerous bruises on her face and scratches on her chest and back. They could not estimate when or how the bruises occurred. Complainant told them that she had been raped.

John Potts, defendant's brother, testified for defendant. He received a call from complainant in the summer of 1986. Pretending to be defendant, Potts asked her why she had said that he had raped her. Complainant said that her mother forced her to do so because of defendant's beating. On cross-examination, Potts conceded that he did not promptly tell police about this call. Nor did he produce telephone records which could verify such a telephone call took place. On rebuttal, complainant denied ever making such a call.

Charles Feltman, a half brother of defendant, testified that he was sleeping on the living room floor of defendant's house on the night of the subject incident. At between 1 a.m. and 3 a.m., he let defendant and complainant in the house's front door. He had been asleep about an hour and a half. Complainant and defendant went into the dining room and had a discussion sitting at the table. He heard nothing unusual. After they went to the basement, Feltman heard no screams coming from the basement. He saw complainant leave the house; he did not hear defendant applying any force against complainant or threatening same. On cross-examination, Feltman explained that he was asleep when complainant left the house and was then awakened by a cold draft created when she opened the front door. Feltman saw her walking down the front steps as he closed the front door.

David Williams and Marsha Graves each testified that they attended the party at Williams' house on February 25, 1986. With some minor inconsistencies, their testimonies were essentially the same. At some point, complainant got into an argument with the aforementioned Rick. A fight ensued in which complainant grabbed Rick's throat and ripped off his gold chain. Further, complainant kicked Rick in the groin. Defendant pulled complainant away from Rick and took

her outside. The witnesses saw the two fighting each other, with both throwing punches. Complainant fell to the ground, and Williams pulled defendant away from her. Williams saw that defendant's face and neck were scratched.

Charlyn Wilson was also at the party. Her testimony was essentially the same as that of Williams and Graves, with the exception that she did not see defendant throwing punches at complainant when they had gone outside. Wilson saw defendant fend off the complainant who, at one point, fell against the car, hitting her head.

Defendant testified that he had known complainant since late 1984. From that time, he had seen complainant two or three times a week and at school as well. They had engaged in oral and vaginal sex on at least 20 occasions while dating, and he had had sex with complainant in his home a week prior to the subject incident.

On February 25, 1986, complainant drove to defendant's house in her car and picked him up to go to David Williams' residence. Defendant was 17 years old at the time. About six people were there. At some point during this evening, complainant and the above-mentioned Rick started quarreling in the kitchen. Complainant grabbed for Rick's neck, and defendant tried to pull her off. Complainant kicked Rick in the groin. Complainant and defendant went outside, talking about complainant's behavior toward Rick. Complainant said she was not comfortable at the party and wanted to leave. They returned about 10 minutes later. Complainant and defendant then drank more and ate some pizza. After going outside again, they began arguing about Rick. This time they started fighting. Defendant pushed the complainant, her back and head striking her car. Defendant then hit the right side of complainant's head with a closed fist. He hit her two or three times. They were wrestling with each other when Williams broke up the fight.

Complainant, defendant and Rick left Williams' residence in complainant's car. After dropping off Rick, they went to defendant's home. Defendant took complainant's car keys because she was a bit intoxicated and the road conditions were not good. Complainant agreed to come into his house. Chuck Feltman let them in, and they talked for a while about what had happened earlier in the evening. After about 10 minutes, they went down to defendant's basement bedroom. Defendant did not force complainant to go there. She had been in his bedroom three or four times before.

As they were sitting on his bed, defendant apologized for his behavior towards her at the party. They began to kiss. Defendant asked complainant about having sexual intercourse. She replied that she was

having her period. He then asked her for oral sex, and she complied. They were in his bedroom for 30 or 40 minutes. Defendant then walked complainant to her car, and he again apologized for what had occurred earlier that night.

Five photographs taken of complainant's face on the day following the incident were entered into evidence. These pictures are of varying quality and indicate the following: a bruise under her right eye, a reddish blotch on her left cheek and several scratches on her chest.

The parties initially argue as to the proper standard to be applied in reviewing the trial court's judgment. Defendant argues that in an aggravated criminal sexual assault case, the complainant's testimony must be clear and convincing or properly corroborated. (*People v. Laughlin* (1987), 163 Ill. App. 3d 115.) The State responds that the proper standard is now that an appellate court must view the evidence in a light most favorable to the prosecution, and, after doing so, if proof of the essential element of a crime supports a conviction, the court must affirm. (*People v. Schott* (1991), 145 Ill. 2d 188.) The State has the better of the argument, and we will review this cause in light of the standard set out in *Schott*.

Defendant points to the inconsistencies of complainant's testimony and other elements of the record, while the State maintains that no inconsistencies are sufficient to overturn the jury's verdict.

■ We admit to finding this record fraught with contradictions. On the one hand, complainant testifies that she was fearful of defendant in his bedroom and, thus, was forced to submit to a nonconsensual sexual act. On the other hand, the evidence of the witnesses, including complainant, depicts her as a person ready and willing to fight physically with those who cross her. Furthermore, the issue of when and where complainant received the scratches and bruises is obscured by the record. Defendant claims that he hit complainant two to three times in the face during a fight in Williams' backyard. Witnesses from the party corroborated his story. Also, testimony of all witnesses, including complainant, indicates that she fought with a Hispanic male named Rick in Williams' kitchen. Complainant admitted grabbing for Rick's throat and kicking him in the groin. Several witnesses stated they saw Rick grab for her jewelry, and complainant testified that Rick damaged some of her jewelry.

Moreover, the pictures of complainant taken the day following the alleged incident do not portray a badly beaten person. Most of the pictures are of poor quality. The clearest photograph shows that the area around complainant's right eye is bruised. Another picture of poorer quality indicates a possible bruise on complainant's left cheek. Two

scratches are also visible on the upper portion of her chest. These photographs do not support complainant's assertions that she was badly beaten.

Furthermore, complainant's testimony and her actions do not necessarily jibe. Complainant testified that at one point during the party she had an argument with defendant during which he pushed her against her car. Complainant stated that she was then scared of defendant. She nevertheless drove him home and proceeded into his house, despite her alleged fear of him, rather than finding some way to get away from defendant.

Our considerable doubts notwithstanding, under the above-cited standard by which we are to review such cases, we will not overturn the jury's determination of defendant's guilt.

Next, defendant argues that the trial court erred in denying his post-trial motion. Said motion argued that defendant was denied a fair trial because juror Mary Johnston failed to disclose relevant information during *voir dire*, namely, that her daughter had been murdered by the latter's boyfriend and that she knew at least two of the people on defendant's prospective witness list, Marsha Graves and Lola Brummel.

During Johnston's *voir dire*, the following exchange took place:

"Q. Have you or a member of your family or close friend or relative ever been charged with or been the victim of a crime?

A. Someone broke into my house."

She made no other response. Further, she denied knowing any of the prospective witnesses.

At the hearing on defendant's post-trial motion, Marsha Graves testified that she had been a witness for the defense in the February 1990 trial. Graves recognized juror Johnston while she was testifying. Graves had known Johnston for about eight years. Lola Brummel, defendant's mother, testified that she was on defendant's witness list. Brummel testified that she had known Johnston for about 12 years and that they had attended barbecues and other "little get togethers."

Mary Johnston also testified at the post-trial motion hearing. She knew that Marsha Graves was the daughter of Judy Graves, one of her co-workers. She further stated that "I know [Marsha Graves] when I see her." But Johnston stated that she did not realize that she knew Graves until a day after the trial concluded, when Judy Graves told Johnston that Graves' daughter, Marsha, testified at trial. Johnston denied telling any of the other jurors that she knew Marsha Graves by sight.

Johnston also stated that she had been acquainted with Lola Brummel for about 10 years. She did not know that defendant was Brummel's son. Johnston admitted telling other jurors that she knew who Lola Brummel was, but she denied that this disclosure affected the jury's decision. Further, Johnston testified that her daughter had been murdered by the daughter's fiance in 1981. She stated that this fact did not in any way affect her decision in this case.

In ruling on this issue, the trial court, relying on *People v. Hunt* (1983), 112 Ill. App. 3d 138, stated:

> "It seems to me that she [Johnston] should have responded that she had a kid who was a victim of *** some type of murder. I don't know whether it was a sexual offense or not. I assume it is. But based on the *Hunt* case, I can't do anything about it. There was not any false testifying that I know of."

■ While the accused's right to trial by an impartial jury is basic, a juror's failure to reveal potentially prejudicial information or giving false testimony during *voir dire* does not automatically entitle a defendant to a new trial. (*People v. Hunt*, 112 Ill. App. 3d at 141.) The standard to be applied is actual prejudice to defendant. 112 Ill. App. 3d at 141.

In *Hunt*, the defendant was a pimp who was charged with the murder of a 15-year-old prostitute. During the *voir dire* examination, the trial court asked the following question of a group of prospective jurors: "Do any of you have close relatives, a husband or wife, or a sister or a brother, or son or daughter that [*sic*] has been the victim of a crime? If so, please stand." Eugene Johnson did not stand in response to this question. Johnson responded in the affirmative to the question: "Have any of you *** ever been a victim of a crime?" Johnson stated to the court that he had been the victim of an armed robbery and that no one had been charged for that crime.

During defendant's motion for a new trial, Johnson testified that when he was seven years old, his sister had been beaten to death by a pimp. Johnson further testified that, despite what had happened to his sister, he was nonetheless able to render a fair and impartial verdict and that he had not discussed the matter with the jury. The *Hunt* court concluded that the trial judge's determination as to the impartiality of the juror was not against the manifest weight of the evidence.

■ We find that the appeal at bar is factually distinguishable from *Hunt*. Here, juror Mary Johnston proved to be far less believable than the juror Eugene Johnson in *Hunt*. The trial court asked her directly whether a family member had been the victim of a crime.

She did not state that her daughter had been murdered. It is highly improbable that she would forget such a tragic occurrence.

Furthermore, the trial court asked Johnston whether she knew anyone on the list of potential witnesses, which included Marsha Graves and Lola Brummel. She replied in the negative. At the post-trial hearing, Johnston testified that she would know Marsha Graves when she saw her. Yet she then testified that she did not recognize Graves during the latter's trial testimony. Johnston further stated that during the jury's deliberation on the case she still had not recognized Graves. This confusing testimony adds to our concerns about Johnston's veracity.

Finally, Johnston's testimony regarding Lola Brummel, defendant's mother, seems improbable. At the post-trial hearing, she testified that she had known Brummel for about 10 years but she did not know her last name, thus explaining her failure to alert the trial court. Taken alone, this testimony would not have much impact, but, when added to the above-cited inconsistencies, it serves to increase our considerable doubts concerning the reliability of her testimony.

Given the discrepancies in Johnston's testimony, we find that the trial court erred in denying defendant's motion for a new trial. Said discrepancies rise to the level of actual prejudice to defendant's right to a trial by a fair and impartial jury. Accordingly, we find that the trial court erred in failing to grant defendant's motion for a new trial.

We next address the issues raised on appeal which may surface again upon retrial of defendant.

■ Defendant argues that the trial court improperly refused to tender defendant's battery instruction to the jury. We find this court's previous decision in *People v. Leonard* (1988), 171 Ill. App. 3d 380, to be dispositive of this issue. In *Leonard*, we found that in cases where defendant is charged with aggravated criminal sexual assault and not charged with battery, defendant is not entitled to a battery instruction. Moreover, the *Leonard* court found that, even if the battery can be isolated from the sexual assault, battery was not charged by the State; there is no support for a battery instruction. Furthermore, the *Leonard* court rejected defendant's alternative argument that battery is a lesser included offense of aggravated criminal sexual assault. Accordingly, the *Leonard* defendant was not entitled to a lesser included offense instruction covering the crime of battery. (See also *People v. Casey* (1989), 179 Ill. App. 3d 737.) Based upon *Leonard*, we find the trial court properly refused to tender defendant's battery instruction.

Defendant's next argument is that the prosecutor's closing argument denied defendant a fair trial. At trial, defense counsel failed to

object to allegedly improper statements, and this argument was not raised in defendant's post-trial motion. Generally, such a failure constitutes a waiver of the claimed error on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176; *People v. McCall* (1989), 190 Ill. App. 3d 483.) Nevertheless, we shall address this issue. Prior to jury trial in this cause, defendant made a motion *in limine* to bar any reference by the State to flight by the defendant. The trial court granted the motion, stating that "[i]t cannot be raised by the State. It may be inquired into on cross examination depending upon what Mr. Potts testifies to."

■ The issue was not raised by defendant nor inquired into on cross-examination by the prosecution. However, in that portion of the prosecution's closing argument which dealt with the alleged phone call between complainant and Jeff Potts, reference (emphasized below) was made to the fact defendant had not been apprehended for the subject offense. Specifically, the prosecution stated:

"And the ludicrous account of the supposed phone call from [complainant] which she thought was Steve Potts coming from that very, very nonbiased source, the defendant's brother, Jeff Potts, who has this great information. Yet he doesn't call the police. He doesn't call the phone company to get records. He doesn't do anything. Just four years later shows up in court and says this is what happened.

I suppose if one of you called one of your friends and said, hi, this is Ronald Reagan, that friend would say they talked to Ronald Reagan. You can't take his word for that and you know you don't. Because if it had happened he would have told somebody. *He knew his brother was wanted at the time,* but no, he comes into court and gives you this fairy tale when [complainant] tells you she never called him." (Emphasis added.)

We find the reference to defendant's being wanted at the time of the phone call implied that he had taken flight from prosecution. As such, it was an improper breach of the motion *in limine* granted by the trial court, and the prosecution is directed to make no such statements upon retrial.

■ Further, defendant maintains that during its closing argument the prosecution misstated the law applicable to aggravated criminal sexual assault, based upon bodily harm (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)). Specifically, the prosecution argued, "So bodily harm existed here and all that was relevant is did it exist at the time of the sexual assault." While not conceding that the prosecutor misstated the law, the State concedes that the language used by the pros-

ecutor was imprecise. We agree. Upon retrial, any reference to the relevant statute should leave no doubt that for defendant to be convicted of aggravated criminal sexual assault it must be proved that the bodily harm was contemporaneous to the criminal sexual assault.

Next, defendant argues that the trial court improperly permitted portions of Dawn Davis' testimony. At an *in camera* conference regarding the admissibility of Davis' testimony, defense counsel did not object to allowing Davis to testify to the fact that complainant told her that she had been raped. Defense counsel objected to Davis' testimony as it related to other statements made by complainant, namely, details of the party, the drive to defendant's home and what allegedly occurred at defendant's home. The trial court ruled that the disputed testimony was admissible as a spontaneous utterance.

Defendant argued before the trial court and argues before this court that the subject testimony is impermissible hearsay, not a spontaneous utterance. To constitute a spontaneous declaration, an utterance exception to the rule against hearsay, three factors must be present: (1) an occurrence which is sufficiently startling to produce a spontaneous unreflecting statement; (2) the absence of time to fabricate; and (3) the statement's relationship must relate to the circumstances of the occurrence. (*People v. Russell* (1988), 177 Ill. App. 3d 40, 46.) The trial court has considerable discretion in determining whether a statement is admissible as a spontaneous declaration, and its decision will not be reversed absent an abuse of discretion. *People v. Washington* (1984), 127 Ill. App. 3d 365.

Defendant argues that the record demonstrates complainant had ample time to fabricate the statements she made to Davis. Complainant testified that after she left defendant's house she drove for an indeterminate time on snow-covered roads. She was crying and hysterical. She first went to the home of a friend, who was not home. She then drove to a public telephone and phoned Davis, who testified that about 15 minutes elapsed between the phone call and complainant's arrival at Davis' home. Davis stated that complainant was hysterical upon arriving at her home.

Under this evidence, we find the absence of an opportunity to fabricate. The testimony indicates that complainant was emotionally distraught from the time she left defendant's house to her arrival at Davis' residence. This is sufficient evidence to support the trial court's decision to permit Davis' testimony under the spontaneous declaration exception.

We do not need to address the issues raised by defendant relating to his sentence.

For reasons stated above, we reverse the trial court's judgment, and this cause of action is remanded for a new trial.

Reversed and remanded with directions.

McLAREN and INGLIS, JJ., concur.