THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EMMANUEL IKPOH, Defendant-Appellant.

Second District   No. 2—90—1233

Opinion filed March 4, 1993.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton, and Sean T. Maloney, of Chapman & Cutler, of Chicago (William L. Browers, John X. Breslin, and Judith Kelly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Emmanuel Ikpoh, was charged in the circuit court of Du Page County with the offense of aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—16(d)). Following a bench trial, the court found defendant guilty and sentenced him to three years' probation with 60 days of that term to be served in the county jail.

Defendant appeals, contending: (1) that the superseding indictment was insufficient to charge an offense; (2) that the conduct for which he was convicted constituted a medical procedure performed in a manner consistent with reasonable medical standards; and (3) that the complainant's prior consistent statement was improperly admitted into evidence under the spontaneous utterance exception to the rule against hearsay.

Defendant was originally charged by indictment with aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, par. 12—16(d)). That indictment was later replaced by a superseding indictment wherein it was alleged that on August 24, 1989, the defendant had committed the same offense

> "in that said defendant knowingly committed an act of sexual conduct upon M.E.H., who was at least 13 years of age but under 17 years of age, in that the defendant touched the vaginal area of M.E.H. for the purpose of the sexual arousal of the defendant and the defendant was at least five years older than M.E.H. *** "

At trial the complainant, M.E.H., testified that she spent the morning of August 24, 1989, with her father and sister, registering for high school. At registration she was given a medical physical form which had to be completed before she would be allowed to participate in sports at school. After registration the complainant's father dropped her off at home, returned to work, and called defendant, Dr. Emmanuel Ikpoh, to schedule an appointment for the physical examination. At that time

defendant had been attending the complainant's family for two years and had seen the complainant on two or three prior occasions. Defendant's office was located in a shopping mall where complainant and her friends frequently would go, both to patronize businesses there and, occasionally, to socialize in the parking area behind the stores. The complainant acknowledged that on one occasion during the summer of 1989 she and a group of young people, including G.M., were standing around behind defendant's office looking at his blue Mitsubishi sports car. At that time she saw defendant.

The complainant's father obtained an appointment for her at noon on August 24 and arranged to meet her there. According to the complainant, she arrived at the office at 11:55 a.m. and sat in the waiting room for five minutes until the lady at the desk took her into a room and weighed and measured her. The complainant was then moved to another examining room.

The complainant seated herself at the end of the examining table. Defendant came in, checked her ears, throat, eyes, and reflexes, and took her heartbeat. According to the complainant, the doctor began talking about her friend G.M. and asking her if G.M. was her boyfriend. When the complainant said that he was not, defendant asked her, "Why not?" The complainant recalled that as defendant kept asking her that question, he moved his hands higher up under her shirt. The complainant said that defendant lifted her bra "and his hand was around my breast, and he was like—he had the stethoscope in his hand, but it was massaging." When asked what she meant by "massaging," complainant replied, "[h]is hand was just feeling around, really, I guess."

On direct examination, the complainant said that after listening to her heartbeat defendant told her that some people had damaged his car which was parked in back of his office. The complainant knew which car the defendant was referring to; however, she said that she did not know about the damage. The complainant told defendant that some kids in the neighborhood might have done the damage. The complainant stated that the defendant used crude language when he spoke about the damage to his sports car.

Defendant proceeded to take complainant's blood pressure and to administer an inoculation. The complainant testified that she told defendant she was afraid that the shot would hurt. He responded by offering to do it in her "behind" which would not hurt as much. She replied, "like, no, that's okay, I will just get it on my arm." Defendant then said, "[a]re you sure *** how long have I been your doctor *** can't you trust me." Defendant gave her the shot in her arm and it did not hurt. After giving the complainant the shot, defendant asked her if

she was having any problems. The complainant replied that she had had a problem with her lower back a month ago but that it had not hurt since then.

On cross-examination with the use of an anatomical chart, the complainant indicated that the pain was located at the lower end of her back. According to the complainant, she also had pain two months before the last recurrence.

The complainant recalled defendant asked her a series of questions concerning her back such as where the pain had started, how long she had it, and the extent of the pain. He also asked if she had taken any medication for the pain. When the complainant replied negatively, defendant suggested that she try aspirin and a cream such as "Ben Gay" to heat the area. Defendant offered to apply a muscle-relaxing lotion to soothe the pain, and the complainant replied, "[O]kay."

The complainant recalled that she lay on the examining table on her stomach. Defendant told her to take down her pants a little so that he could apply the lotion, and the complainant lowered her pants to her lower back. Her shirt was up off her back as defendant rubbed in the lotion. The complainant testified that defendant then told her that she was going to have to take her pants down lower so that he could get the muscles on the back of her knees and her back muscles. The complainant did lower her pants to her knees; she also lowered her underpants at the direction of defendant.

The complainant stated:

"[Defendant] started putting the lotion on my back, and he was just rubbing it on my back, and then he moved to my behind and then he was saying is it getting warmer, is it getting warmer, and I said yes ***."

The complainant stated that after rubbing the lotion on her buttocks, defendant told her "to get in a position where my behind was in the air and I was—my weight was on my knees and my arms, like my elbows." The complainant complied. Defendant then applied the lotion on her inner thigh and then went in between her legs. The complainant recalled that defendant was moving his hand "sideways in a sidewardly direction" and touching her vagina. When asked how long defendant had his hands on that part of her body, the complainant said, "I just know that he had his hands there longer than he had it on my inner thigh, my behind, or my back." The complainant recalled that defendant applied the lotion with his bare hands; he wore no glove.

The complainant further testified that while defendant was applying the lotion, he told her that he would give her his beeper number "and I could beep him any time I wanted this done again and my mom doesn't

have to know." The complainant also said that defendant told her he needed secretarial help at his office and asked if she would be able to do that job. She told him "Yes."

On cross-examination, the complainant said that she thought the cream defendant used was called "Myoflex." The complainant admitted that when she told defendant that her skin was getting warmer as he rubbed the cream in, she was telling the truth, but she could not tell if it was because of the medication or because he was rubbing his hands so fast. The complainant said that she did not experience any burning sensation in her vagina during the incident. The complainant acknowledged that defendant applied the cream to the lower portion of her back, across her buttocks, on to her lower legs, and down to a point above the back of her knees.

The complainant admitted that defendant did not ask her for a date, suggest that she engage in any kind of sex acts with him, use sexual innuendos, or swear at her during the treatment. When asked how it felt when he applied the cream, she said, "It didn't feel good."

According to the complainant, someone knocked on the examining room door while the doctor was applying the cream. The complainant stated that she jumped off of the examining table and pulled up her pants. The complainant recalled that while she was pulling up her pants, defendant told her to "take it easy, take it slow, it is okay, take it slow." Defendant put only his head out of the door to answer the knock. The complainant could not see who was outside the door. After answering the knock at the door, defendant examined the complainant's spine by having her touch her toes. Following this, the complainant walked out of the room, through the door, which she acknowledged had not been locked or barricaded, and into the area where her father was waiting. The complainant acknowledged that she did not cry out for help at any time during the examination, nor did she run out of the examination room.

Defendant, who followed the complainant out of the room, approached her father and had a conversation with him. Defendant told him that if the complainant had any recurring back pain, she should use Myoflex. Defendant gave the complainant a large sample package of Mediprin. The complainant's father paid for the examination and then left with her. After leaving defendant's office, the complainant's father took her for lunch at the Doggie Diner, which was located in the same shopping mall.

Complainant's father, C.H., testified that when he called his daughter to tell her that he had made an appointment for her with defendant, he told her to walk over to defendant's office, and he would meet her

there. C.H. said that he got to the office a few minutes after 12, bringing the school medical form with him. He did not see his daughter. C.H. sat in the lobby and waited for 20 to 25 minutes, when the complainant came out with defendant. C.H. stated that defendant told him that the complainant had complained of lower back pain and suggested that she should apply Myoflex to her lower back if it returned. Defendant gave C.H. some samples and the completed medical form, and then C.H. and his daughter left for the Doggie Diner.

C.H. recalled that when the complainant had come out into the waiting area, he had greeted her. She did not smile at him. C.H. said that during the 20 minutes they spent at the Doggie Diner, his daughter appeared to be "extremely subdued, very quiet. Quieter than normal." She did not mention the examination. C.H. acknowledged that he had a good relationship with his daughter and that she did talk to him about her problems on occasion. On redirect, he stated that if his daughter had a "female" problem, she would talk to his wife about it.

C.H. recalled that he dropped the complainant off at home somewhere between 12:45 and 1 p.m.; he then returned to work. At 4:30 p.m. he arrived home from work, had dinner, and then left to do some shopping because his wife was having a church meeting. When he returned at 10 p.m., he had a conversation with his wife. The next day he spoke to the complainant and then called various Du Page County authorities.

Witnesses for the defense also described events that took place at defendant's office on August 24, 1989. Susan Ikpoh, defendant's wife, testified that she was the only office employee, serving as a receptionist and doing the clerical work, including maintaining patients' records. Mrs. Ikpoh stated that the noon hour of August 24 was particularly busy, as five patients, including the complainant, were seen by defendant within that relatively short period of time. When the complainant arrived, Mrs. Ikpoh told her to sit and wait. According to Mrs. Ikpoh, the complainant's father came in a few minutes later and gave Mrs. Ikpoh the complainant's school physical form. Shortly thereafter, Mrs. Ikpoh's sister and niece, Antoinette and Julia Rodenkirch, arrived. Julia was there for an immunization she needed for high school.

Mrs. Rodenkirch, who also testified, explained that Julia's appointment was for 12:15. The Rodenkirches did not want to wait long because Julia wanted to be at her high school for registration by 1 p.m. Mrs. Rodenkirch observed an older man and a girl about Julia's age in the waiting room. The man was reading.

Mrs. Ikpoh said that the complainant's father sat reading a magazine while the complainant waited to see defendant, who was with an-

other patient. Mrs. Rodenkirch came to the receptionist window and told Mrs. Ikpoh that she and Julia had to be at school by 1 p.m., whereupon Mrs. Ikpoh went down the hall and asked defendant how long it was going to take. She then returned and told her sister that it would not be much longer.

Eventually, a patient came out of an examining room. Mrs. Ikpoh then took the complainant into an examining room to be measured and weighed and asked her to remove her shoes. It was Mrs. Ikpoh's testimony that when the complainant bent over to put her shoes back on, Mrs. Ikpoh noticed that she moved with difficulty. She asked the complainant if she was having problems with her back, and the complainant said that she was. Mrs. Ikpoh recommended that she mention the problem to defendant. She then moved the complainant into another examining room and told her to sit and wait.

Mrs. Ikpoh closed the door to the room and returned to her desk. According to Mrs. Ikpoh, she asked the complainant's father if he wanted to go into the examining room with his daughter, informing him as she did so that it was office policy to have a parent or guardian in the examination room with minor patients. Mrs. Ikpoh said that C.H. declined to do so. Mrs. Ikpoh stated that this office policy was posted on the door facing into the waiting area. Other defense witnesses verified its existence. One witness described the sign as handwritten on a piece of stationery or typing paper.

Mrs. Ikpoh said that about five minutes later Mrs. Rodenkirch again came to the window and asked the witness to warn defendant that she and Julia had to be at her high school by 1 p.m. Mrs. Ikpoh again went to the complainant's examining room and knocked on the door. Defendant told her to come in. She opened the door and saw defendant standing by the counter, filling out the school physical form. She told him about her sister's hurry. He said that he was done and handed her the clipboard holding the school physical form. Mrs. Ikpoh said that defendant then turned to the complainant, who was standing by the sink, wished her good luck in high school, and told her that he was finished. Mrs. Ikpoh said that she was still standing at the doorway when the complainant turned to defendant and said, "Doctor, by the way, I have been wanting to ask you about this problem I have been having." Defendant looked at Mrs. Ikpoh and said, "Okay," whereupon Mrs. Ikpoh left the room and closed the door.

Mrs. Ikpoh then called her sister and niece and put them into an examining room. As she stood in the hallway and talked to her sister, Mrs. Ikpoh stated that she could hear the complainant telling defendant that she had some pain in her back and thighs, and defendant respond-

ing that there was some medication that she could take that might help. Mrs. Ikpoh noted that defendant had a very loud manner of speaking and could usually be heard from adjoining rooms.

After a few minutes Mrs. Rodenkirch again said that she was worried about being late. Mrs. Ikpoh then went to the closed examining room door and knocked. Defendant opened the door. Mrs. Ikpoh testified that the complainant was lying on her stomach on the examining table with her pants pulled down. White cream was on her lower back and upper thighs. Defendant was fully clothed. Mrs. Ikpoh asked defendant if he was finished, and he turned to the complainant and told her that she could get up and get dressed. The complainant sat up, got down off the table, and then went and stood by the sink. Mrs. Ikpoh said she left the room, followed by the doctor and the complainant.

Mrs. Ikpoh recalled that out in the hallway defendant told her that the complainant had expressed an interest in becoming a doctor and wanted to know if they had any openings for her to work at the office. He also said that he had told the complainant that she would have to discuss the matter with Mrs. Ikpoh, as she was the one who handled such affairs. Mrs. Ikpoh saw defendant give the complainant the school physical form, a prescription for Myoflex, a Mediprin sample, and heard him tell C.H. about his daughter's complaint of back pain. Defendant then went in to see the Rodenkirches. According to Mrs. Ikpoh, the complainant told her that she was really excited about the prospect of working at the office. Mrs. Ikpoh replied that they were not looking to hire anyone at that point but that they would keep her in mind. Mrs. Ikpoh said that she also suggested that complainant was not really old enough for a part-time job.

Mrs. Rodenkirch testified that she saw the complainant as she left the examining room. According to Mrs. Rodenkirch, the girl's demeanor was normal, and she chatted with Mrs. Ikpoh.

It was the complainant's testimony that she and her father conversed part of the time they spent together having lunch. She did not mention the examination to him during the meal. She said that she was thinking about the exam while at the Doggie Diner, during the ride home with her father, and when she walked into the door of her house. When she arrived home at 12:45 p.m., she phoned her friend, M.H. M.H., who lived next door, then came to the complainant's home, and the complainant told her what had happened during her physical examination.

The friend, M.H., age 15, appeared as a witness for the State. Prior to her taking the stand, the prosecutor announced that the totality of what the complainant had said to M.H. about the physical exam would

be elicited and offered into evidence under the spontaneous utterance exception to the hearsay rule. The defense objected, and the objection was overruled.

M.H. testified that she received a phone call from the complainant at about 1 p.m., asking her to come over. The complainant's voice sounded "shaky." It took M.H. about two minutes to get to the complainant's kitchen door. No one else was home at the complainant's house.

The first thing the complainant said to M.H. was to remark that M.H. would not believe what had happened. Complainant then told M.H. that "when she went in to get her physical when her doctor was taking her heart beat [*sic*] that he felt her more on her chest than, you know, to take her heart beat [*sic*]."

M.H. also said the complainant told her that

"when she told him about the pains in her back and that, he told her that he would put cream or lotion on her back, but that her back muscles ended at the back of her knees so she would have to pull down her pants so he could put it on her, and that she laid [*sic*] on her stomach so he could put it on her back and he started putting it on her back, then he went between her legs all the way up and started feeling her vagina."

According to M.H., the complainant told her that the defendant touched her vagina most of the time that he was putting the lotion on her.

The complainant told M.H. that she jumped off the table when someone knocked on the door. The complainant also said that defendant told the complainant that she could have a job at his office and that if her back hurt and she wanted him to apply the cream again, she could come in and he would do that and she would not have to tell her mother about it. M.H. related that the complainant also stated that defendant told her she could use his beeper number to call him. According to M.H., the complainant was crying and shaking during their conversation. M.H. stated that she comforted the complainant and advised her to tell her mother.

On cross-examination, M.H. said that she and the complainant were both in 10th grade and saw each other everyday, both at school and "hanging around" afterwards. She acknowledged that she was aware of the complainant's back pain problem which the complainant would mention once in a while, including during the summer months of 1989. M.H. also acknowledged that the complainant did not tell her that the cream had burned or caused pain in the complainant's vagina.

M.H. said that she and the complainant were at the mall where defendant's office was located "maybe every other day" during **July and**

August 1989. M.H. denied being behind the defendant's office with the complainant and others when defendant came out and spoke to the complainant and G.M. about his automobile. M.H. also denied approaching defendant's office with a group of girls, including the complainant, in September 1989.

The complainant's mother, S.H., testified that she was at work on the afternoon of August 24. She received a phone call from her daughter at about 3 p.m. She had a second conversation with her daughter at home at 5:30 p.m., during which the complainant was crying and upset. At 10 p.m., S.H. spoke to her husband.

Defense witness Susan Ikpoh also testified regarding events that preceded and followed the day of the alleged offense. According to Mrs. Ikpoh, defendant's 1990 Mitsubishi sports car was "keyed," in May or June 1989, while parked behind the office. The episode disturbed both defendant and her. Mrs. Ikpoh stated that in May and June 1989 she had observed a group of teenagers "loitering" in the area behind the office. One was G.M., whom she recognized because he was a patient of defendant's; another was the complainant. Mrs. Ikpoh also saw a number of other boys and girls in that area, including M.H., complainant's friend.

Mrs. Ikpoh further testified that on two occasions in September 1989 groups of teenagers, including the complainant and M.H., were seen around defendant's office. On September 5, Mrs. Ikpoh saw them standing in front of the window looking in at her. According to Mrs. Ikpoh, the teenagers moved to an area across from the window where they stood pointing at the office and laughing for two or three minutes. The girls then spent 20 to 25 minutes walking back and forth in front of the office windows. Mrs. Ikpoh also testified that on September 12 she and defendant were standing in the reception area when they heard the outside door open and someone enter. Mrs. Ikpoh looked out and saw the complainant. When the complainant saw Mrs. Ikpoh, she opened the door and went outside and joined M.H., G.M., and another boy. It was Mrs. Ikpoh's testimony that when she went to the garbage dumpster behind the office about an hour and one half later, she saw the same foursome in the rear area, talking and passing a hand-rolled cigarette back and forth.

James Grady, an investigator with the Du Page County Children's Office, testified that on August 31, 1989, at 12:30 p.m. he went to defendant's office with his partner and the complainant's father to serve a grand jury subpoena for medical records kept on the complainant.

Grady stated that at 12:50 p.m. he saw the defendant enter from a back door. Twenty-five minutes later defendant met with Grady. They

went to defendant's office, where he opened the complainant's file, took out the complainant's physical form, and a medical chart document. As he did so, defendant commented that when the complainant had been in for a physical examination on August 24, it was a very busy day, and he had had to write fast.

Grady and defendant discussed complainant's school physical form on which all of the general body functions listed were checked "normal." Defendant also had checked the box indicating that the complainant could participate in sports and physical education. Grady said that they also discussed another document, a progress note written by defendant regarding the complainant's back pain problem and the treatment that she had received for it.

Grady testified that defendant explained to him that the complainant had complained of aches in her back, legs, thighs, and groin. She told defendant that she had had the pains for about a week. According to defendant, the complainant asked him "if he would rub it" and he did so, using Myoflex cream. Grady asked defendant if he possibly could have touched the complainant's vaginal area while applying the cream, and the defendant said that he could have done so, as it was necessary for him to rub the cream in the region where the groin joins the upper legs. Grady said that defendant had added that as he applied the cream he saw spasms on the upper inner thighs and directed his rubbing in that area.

Grady recalled that defendant said he told the complainant that she had sprains in her thighs, that she should apply heat and Myoflex, and that she should continue to participate in sports and gym class. Defendant also informed Grady that it was his policy to have his wife in the examining room whenever he did procedures involving the genital area of a patient; however, on this occasion she was not present.

Defendant also told Grady that while he was applying the cream, there was a knock on the door. When he opened the door a bit to see who it was, the complainant got off of the examining table. When Grady asked if defendant had offered the complainant a job, defendant said that while they stood in the reception area he had had a conversation with her about helping out his wife. Grady stated that defendant also admitted that he had talked to the complainant about giving her his beeper number but said that he had not given her the number.

The parties called five medical doctors to testify as experts. Dr. Ronald Ferguson testified on behalf of the State. Dr. Ferguson reviewed the complainant's school physical form and the progress note prepared by defendant regarding the complainant's back pain. Dr. Ferguson evaluated the progress note, which he acknowledged was prepared using the

standard format used by medical practitioners. He felt that in view of the contents of the progress report the school physical form should not have been filled out so as to indicate everything was "normal." Dr. Ferguson also criticized the contents of the progress note, which he found too scant to have allowed defendant to make a full and accurate diagnosis of the complainant's back problem.

Dr. Ferguson disapproved of defendant's choice of Myoflex for use on the complainant. In his opinion it would not be appropriate therapy for a physician to place Myoflex cream on the inner thighs and genital area of a patient. Dr. Ferguson also opined that a physician should have a third party in attendance when examining a female patient, should have the patient wear a gown or use a drape, and should wear a glove on his examining hand. Dr. Ferguson also agreed with the prosecutor that it would never be appropriate to examine a female's genital area "from behind when the patient is on all fours." Dr. Ferguson stated that it is not consistent with reasonable medical standards to examine a 13-year-old patient "while she is on all fours from behind, examining her—touching her vaginal area."

Dr. Ferguson was asked to describe the area between a female's legs. He testified that the external skin surrounding the vaginal opening is called the labia majora, beneath which is the labia minora. This inner surface excretes fluids. The vagina goes from the labia minora to the uterus. The vagina is a mucous membrane. Looking at a chart of the human nervous system, Dr. Ferguson pointed out that there are nerves running from the lower back and down the legs.

Dr. Ferguson could not say if aspirin or an ointment like Ben Gay would be appropriate treatment for soreness in the area of the gluteus muscle. He stated that he did not have enough information to determine what the appropriate treatment would be for a complaint of lower backache and gluteus muscle soreness but stated that it would not be usual for a physician to apply Myoflex cream as a remedy.

Four physicians testified for the defense regarding the propriety of defendant's treatment of the complainant's back pain problem. All four stated that the progress note prepared by defendant was in the proper form and adequate for its purpose. The doctors also verified Dr. Ferguson's admissions on cross-examination that the muscle and nervous systems of humans connect the lower back with the gluteus maximus and legs from the upper area down to the back of the knees. Each doctor opined that the treatment described in the progress note was appropriate for the patient and the complaint described therein and was consistent with reasonable medical standards. The doctors also noted that

Myoflex, like Aspercream or Ben-Gay, gives a sensation of heat and would irritate the vaginal or anal areas.

Three of the doctors for the defense addressed the inconsistency, raised by Dr. Ferguson, between the school physical form, which rated the complainant "normal" in all the areas listed, and the progress note, which described her complaint of pain and the treatment program prescribed. According to the doctors, it would not be appropriate to note a temporary condition such as the complainant's backache on a school form which is valid for an entire school year. Only persistent, chronic conditions should be included on a school form. Doctor Lynda Lane also noted the practical ramifications of listing such a temporary condition, stating that it would keep a child from participating in sports or gym class and would include the high likelihood of repeated contacts with the school nurse.

The defense experts disagreed with Dr. Ferguson's opinion that defendant should have had complainant put on a gown or used some kind of draping to cover her body while he applied the cream, that he should have worn gloves for such procedure, and that he violated a professional standard when he failed to do so. Dr. Emmanuel Nwokocha said that he had used Myoflex cream in his practice and noted that gloves would make application of the cream difficult, as the cream would stick to them.

On cross-examination, Dr. Frank Becker acknowledged that defendant's attorney was representing him on a legal matter. Dr. Lane stated that she had known defense counsel since 1972, that she had testified in two other cases handled by him, and that he had prepared her prenuptial agreement. Defense expert Dr. Geoffrey Korn stated that he is married to Dr. Lane. Doctors Becker, Lane, and Korn acknowledged that they were each paid $200 per hour for their participation in the instant case.

The State's expert did not offer a definition of "female sex organ" during his testimony. Three of the four defense experts testified that the female sex organ consists of the vagina, the fallopian tubes, and the ovaries. The fourth, Dr. Nwokocha, expressly stated that the labia majora is not a sex organ.

After hearing all of the evidence and the arguments of counsel, the trial court found defendant guilty of aggravated criminal sexual abuse. In its finding, the court commented that it found the complainant to be a "very good, credible witness *** clear, concise, convincing, believable" and that her testimony was corroborated by her actions and by her statement to M.H. The court characterized M.H. as a "key witness" whose testimony the court found to be "powerful." The court also found

Dr. Ferguson to have been a "credible" witness, "very well qualified," and not a "professional" witness, noting that Ferguson was not compensated for his testimony as were three of the four defense experts, whose credibility the court rejected for the most part. In rejecting their testimony, the court emphasized that the key factor in the testimony of defendant's medical witnesses was their assumption that the information contained in the progress note and the school physical form was truthful.

The trial court sentenced defendant to serve three years of probation, with the conditions that he spend 60 days in the county jail and that he pay $825 to the complainant as restitution for her psychological counselling fees.

On appeal, defendant argues that the superseding indictment was insufficient to charge the offense of aggravated criminal sexual abuse because it did not state defendant touched the sex organs, breast, or anus of the 13-year-old complainant. The indictment stated that

> "on or about the 24th day of August, 1989, at and within Du Page County, Illinois, EMMANUEL C. IKPOH, committed the offense of AGGRAVATED CRIMINAL SEXUAL ABUSE in that said defendant knowingly committed an act of sexual conduct upon [M.E.H.], who was at least 13 years of age but under 17 years of age, in that the defendant touched the vaginal area of [M.E.H.] for the purpose of the sexual arousal of the defendant and the defendant was at least five years older than [M.E.H.] in violation of *Illinois Revised Statutes* 1989, Chapter 38, Section 12—16(d) ***."

As set forth in section 12—16(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(d)), the section under which defendant was charged:

> "The accused commits aggravated criminal sexual abuse if he or she commits an act of sexual penetration or sexual conduct with a victim who was at least 13 years of age but under 17 years of age and the accused was at least 5 years older than the victim." (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(d).)

"Sexual conduct" is

> "any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of the sex organs, anus or breast of the victim or the accused, or any part of the body of a child under 13 years of age, for the purpose of sexual gratification or arousal of the victim or the accused." (Ill. Rev. Stat. 1989, ch. 38, par. 12—12(e).)

Defendant contends that to charge him with aggravated criminal sexual abuse the indictment had to state that he touched one of the three parts of the body set forth in section 12—12(e), *i.e.*, "the sex organs, anus or breast." Thus, defendant asserts, the indictment was too nonspecific to charge the instant offense because touching the complainant's "vaginal area," as stated in the indictment, did not constitute an offense under the language of the aggravated criminal sexual abuse statute. Ill. Rev. Stat. 1989, ch. 38, par. 12—16(d).

To give a court jurisdiction in a criminal case, the indictment or information must charge the accused with a crime. (*People v. Nibbio* (1989), 180 Ill. App. 3d 513, 518.) A charge is sufficient to withstand a motion in arrest of judgment, as was filed here, if the indictment or information sufficiently states the necessary elements of the offense so that by the language used the defendant is apprised with reasonable certainty of the precise offense of which he is charged. (180 Ill. App. 3d at 518.) Section 111—3(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 111—3(a)) sets forth the requirements for the form of a charge. That section provides:

"(a) A charge shall be in writing and allege the commission of an offense by:

(1) Stating the name of the offense;

(2) Citing the statutory provision alleged to have been violated;

(3) Setting forth the nature and elements of the offense charged;

(4) Stating the date and county of the offense as definitely as can be done; and

(5) Stating the name of the accused, if known, and if not known, designate the accused by any name or description by which he can be identified with reasonable certainty." (Ill. Rev. Stat. 1989, ch. 38, par. 111—3(a).)

An indictment or information charging an offense defined by statute should be as fully descriptive of the offense as the language of the statute and should allege every substantial element of the offense as defined by the statute. 180 Ill. App. 3d at 518.

■ In the instant case, the indictment was in full compliance with the requirements in section 111—3(a). It named the offense, cited the statutory provision violated, set forth the nature and elements of the offense charged as stated in the language of the statute violated, stated the date and county of the offense, and stated the name of the accused. Section 111—3(a) required nothing more. Other phrases included in the indictment such as "touched the vaginal area" constituted mere surplus-

age. We conclude that the words "sexual conduct" standing alone were sufficiently specific to inform defendant with reasonable certainty of the offense he was accused of committing and that it was not necessary that the specific sexual conduct be defined in the indictment.

Similar determinations were reached in *People v. Lewis* (1986), 147 Ill. App. 3d 249, 252, and *People v. Balle* (1992), 234 Ill. App. 3d 804, 813. Although the victims in those cases were under 13 years of age, we, nevertheless, believe the determinations reached there regarding the sufficiency of the words "sexual conduct" in informing a defendant with reasonable certainty of the offense with which he was charged are also applicable here. We find the superseding indictment was sufficiently specific to charge the offense of aggravated criminal sexual abuse pursuant to section 12—16(d) of the Criminal Code of 1961. Ill. Rev. Stat. 1989, ch. 38, par. 12—16(d).

Defendant argues that the evidence was insufficient to prove, beyond a reasonable doubt, that he committed an act of sexual conduct. To be guilty of sexual conduct, defendant asserts, the State had to prove that defendant touched the "sex organs, anus or breast" of the complainant for the purpose of sexual gratification or arousal of defendant. (Ill. Rev. Stat. 1989, ch. 38, par. 12—12(e).) Defendant maintains that the State failed to prove that defendant touched one of the three body parts specified in section 12—12(e). We do not agree.

Defendant maintains that the testimony was too imprecise to prove that defendant had touched any of the complainant's sex organs.

The defendant argues that the testimony of his four physician witnesses established that the sex organs of a female are limited to the uterus, fallopian tubes, and vagina. Additionally, defendant asserts, his witnesses acknowledged that if Myoflex, a muscle-relaxing cream which causes a sensation of heat when applied to the body, comes into contact with a mucous membrane, such as the vagina, it would sting and cause great discomfort. Thus, defendant argues, because the complainant did not state that she experienced any discomfort directly related to the application of the lotion, it is doubtful it was applied to her vagina or to her labia minora. Defendant states that the closest part of the body to which the complainant might have been referring when she stated that defendant rubbed her "vagina" and that her vagina was "in between my legs *** [i]n the front" was the labia majora, the external (skin) covering of the vagina.

However, contrary to defendant's position here, we believe the labia majora are part of the "sex organs" referred to in section 12—12(e) (Ill. Rev. Stat. 1989, ch. 38, par. 12—12(e)), and, in fact, the appel-

late court has already reached this same determination. In *People v. Hebel* (1988), 174 Ill. App. 3d 1, the court stated:

"The definition of the term 'sex organ' is not generally disputed. A comprehensive scientific encyclopedia states that the external female organs of reproduction, *i.e.*, sex organs, include, *inter alia*, the mons pubis, labium majora, labium minora. *** The vagina is considered a deeper, internal structure. (Van Nostrand, Scientific Encyclopedia 1396-97 (6th ed 1983).)" (174 Ill. App. 3d at 31-32.)

The court then went on to determine:

"If the legislature meant for 'sex organ' to mean vagina, it certainly took a simplistic view of the female anatomy. We believe the legislature meant 'sex organ' to be more inclusive and that defendant was proved guilty beyond a reasonable doubt where the testimony indicated that he had touched the inner surface of the victim's labium majora and her labium minora." (174 Ill. App. 3d at 32.)

We are of the opinion that whether the labia majora are a part of a female's sex organs is not a subjective question which can be resolved one way in some cases, such as in *Hebel*, and another way in other cases, such as in the instant one.

Defendant maintains, however, that the trial court did not rely on the *Hebel* decision as legal precedent but as authority for its finding of fact that the labia majora are sex organs. We do not interpret the court's comments in the same manner. Additionally, defendant asserts that the *Hebel* court, unlike the lower court here, was given an evidentiary basis for its conclusion that the labia majora can be considered a sex organ. There, two medical experts testified that the labia majora and labia minora were parts of the female sex organs. Here, defendant argues, Dr. Ronald Ferguson, the State's expert, was not asked to define "sex organ."

Defendant's expert, Dr. Frank Becker, testified that, according to Taber's Cyclopedic Medical Dictionary, the female sex organs "refer to the vagina, to the tubes and to the ovaries." Becker also testified that the labia majora are part of a female's exterior genitalia. Dr. Lynda Lane stated that the female sex organs are "the ovaries, the uterus, and the vagina." The labia majora, according to Dr. Lane, are external genitalia and are an area of skin adjacent to both sides of the thighs.

Another of defendant's experts, Dr. Geoffrey Korn, testified on direct examination that the sex organs of a female are divided into two classes, the external genitalia and the internal genitalia. Dr. Korn pointed out that the "reproductive part of the sex organ is the vagina,

the uterus, fallopian tubes, the ovaries." Dr. Korn stated that his definition of the female sex organs was based on Taber's Cyclopedic Medical Dictionary. On cross-examination, Dr. Korn acknowledged that a female's external genitalia consisted of the labia majora and the labia minora as well as the clitoris and the opening of the urethra.

Although he had previously testified on direct that the external genitalia and the internal genitalia comprised the two classes of a female's sex organ, Dr. Korn stated on redirect that external genitalia are not a sex organ.

Dr. Emmanuel Nwokocha, defendant's fourth medical expert, simply stated that the "labia majora is not a sex organ."

It was the trial court's function to weigh the testimony of defendant's experts and to determine which parts were credible and which were incredible. It is evident from the court's comments in reaching its decision that it rejected their credibility, in large part, finding the experts to be biased or, at times, uncooperative. The court considered the testimony of defendant's experts and concluded, therefrom, that their definition of "sex organ" was strictly from a medical standpoint and was not in compliance with the common usage assigned to it by the legislature. Given the *Hebel* court's prior finding that in using the term "sex organs" the legislature intended the term to mean more than just the medical term "vagina," this was not an unreasonable conclusion for the trial court, here, to reach. The complainant testified that defendant was rubbing her "vagina" which was "in between my legs." The labia majora were shown to be the external covering surrounding the vaginal opening and an area of skin adjacent to the inner thighs. We believe, therefore, that the trial court's decision that defendant committed an act of "sexual conduct" when he rubbed the complainant's labia majora was proper based on the evidence presented and the precedent established in *Hebel*.

In determining whether defendant was proved guilty beyond a reasonable doubt, this court views all the evidence in the light most favorable to the prosecution in order to determine if any rational trier of fact could have found defendant guilty beyond a reasonable doubt. (*People v. Peve* (1991), 209 Ill. App. 3d 1021, 1024.) This court will not substitute its judgment regarding the credibility of the witnesses for that of the trier of fact. (209 Ill. App. 3d at 1024.) Viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found defendant guilty, beyond a reasonable doubt, of committing an act of "sexual conduct" with the complainant.

Next, defendant argues that the State failed to prove by a preponderance of the evidence that the conduct for which he was convicted

was not part of a medical procedure performed in a manner consistent with reasonable medical standards. Defendant also contends that the complainant's testimony was unbelievable in all important respects and predicated on a motive to lie.

Under section 12—18(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 12—18(b)):

> "Any medical examination or procedure which is conducted by a physician, nurse, medical or hospital personnel, parent, or caretaker for purposes and in a manner consistent with reasonable medical standards is not an offense under *** [section] 12—16 of this Code."

In the instant case, the alleged offense occurred during the complainant's visit to defendant, her family doctor, for a school physical examination. Defendant maintains that the sexual conduct, *i.e.*, the touching of the complainant's sex organ, was part of the procedure he employed in an effort to relieve the complainant's back pain and that the complainant agreed to the procedure. Defendant bears the burden of proving by a preponderance of the evidence that this procedure did not constitute a sexual offense and that he is exempt from prosecution under section 12—18(b). (*People v. Foster* (1990), 195 Ill. App. 3d 926, 953-54.) Defendant relies on the testimony presented by his four medical experts to prove that the procedure he used was appropriate for the complainant's complaint and consistent with reasonable medical standards.

■ We note first that it is the trier of fact's responsibility to determine the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn therefrom. (*People v. Steidl* (1991), 142 Ill. 2d 204, 226.) Here, it is evident from the trial court's lengthy exposition at the conclusion of the trial that it was not assigning the weight to defendant's experts that defendant would have preferred for it to assign.

One factor the trial court noted was that three of the four physicians had been compensated for their testimony, while the State's expert, Dr. Ferguson, had not. Additionally, the court noted that two of defendant's experts, Dr. Lane and Dr. Korn, had previously testified as expert witnesses for defense counsel and that defense counsel had represented Dr. Korn in the past and presently represented Dr. Lane and Dr. Becker. Although the court mentioned these facts, it is apparent from the court's comments that these facts alone were not determinative of the court's decision.

Another factor the court believed important was defendant's expert witnesses' reluctance to answer questions regarding a hypothetical situation posed by the State. The court commented that the impression it

received from these experts' testimony on cross-examination was that they were reluctant to answer any of the State's questions unless their answers could be beneficial to defendant. From our review of the testimony, we find the trial court's impressions to be not unreasonable.

Defendant attacks the testimony of Dr. Ferguson, the State's expert, arguing that the doctor spent the majority of his career in teaching and administrative positions and, therefore, was not qualified, as were defendant's experts, to judge whether defendant's treatment of the complainant was performed in a manner consistent with reasonable medical standards. However, the fact that Dr. Ferguson was not a solo practitioner in general family medicine did not make his testimony regarding standards of the medical profession less credible than those of defendant's experts. After a thorough examination by both counsel, the trial court ruled that Dr. Ferguson was qualified to render an opinion as to the reasonable medical standards of treatment. Such a ruling will not be reversed absent an abuse of discretion. (See, *e.g., Wilson v. Clark* (1981), 84 Ill. 2d 186.) We find none here.

The key factor, however, in weighing the medical testimony was, according to the trial court, that the opinions expressed by defendant's experts, regarding the appropriateness of defendant's procedure in treating complainant's complaint of back pain, were based on the progress note contained in complainant's medical file. As the court emphasized, these opinions were based on the premise that the information contained in the note was true.

It is likely, as the trial court concluded, that the progress note was manufactured. This fact was implied through the testimony of the State's expert, Dr. Ferguson, whom the court found to be both qualified and credible. Dr. Ferguson testified that the information contained in the progress note and the information on the school physical form were inconsistent. Dr. Ferguson stated that in comparing the two documents it was impossible to tell if they pertained to the same patient. According to the school physical form, the complainant was "normal" in all respects. But, on the progress note such terminology as "exquisite tenderness" and "acute low back strain" were entered in describing the complainant's health condition. Defendant's experts discounted the differences in the forms by stating that there was nothing inappropriate about not recording temporary complaints or ailments on school physical forms.

Nevertheless, that it was likely that defendant had manufactured the progress note became very apparent during the testimony of the State's witness James Grady, an investigator with the Du Page County Children's Office. Grady testified that on August 31, 1989, he went to

defendant's office to serve a subpoena on defendant for complainant's medical records. Grady waited for defendant to arrive and, in fact, observed defendant arrive at about 12:50 p.m. At that time defendant's wife took the subpoena back to defendant and returned to the receptionist area without it. At about 1:15 p.m. defendant came out to the waiting area to meet Grady. We find it significant, as did the trial court, that approximately 25 minutes transpired between the time defendant learned of the subpoena from his wife and the time defendant met Grady and allowed Grady to look at the file containing complainant's medical records, including the progress note. The defendant had sufficient time to manufacture the information contained in the progress note before showing the complainant's file to Grady.

The progress note stated that the complainant had complained of low back pain, gluteal area soreness and aches and "inner (upper) groin pain" which had been getting worse. Grady testified that defendant told him that the complainant had complained of a backache, leg aches, upper inner thigh aches, and groin aches, and that she had asked defendant "to rub it."

The complainant's testimony was contrary to defendant's representations both in the progress note and in his comments to Grady. The complainant testified that she never complained of any groin pain or pain in her thighs and never said anything about the pain getting worse. Rather, in response to defendant's inquiry as to whether she was having any problems, she told defendant that she had had a problem with her lower back. But, she also told defendant that her back had not hurt for a month.

■ According to the complainant, defendant asked her several questions regarding the pain and then said there was something he could do for the complainant so that the pain would go away. Thereafter, defendant began rubbing lotion on her back and buttocks and also on her inner thighs near her vagina where he rubbed longer than anywhere else. The complainant stated that during this time defendant "told me that he will give me his beeper number, and I could beep him anytime I wanted this done again and my mom doesn't have to know." Defendant also told her that he needed help in the office and asked if the complainant would be able to assist him.

Because the complainant could not recite defendant's beeper number at trial and because she did not allege that defendant did not ask or order her not to tell her father what defendant had done to her, defendant concludes that the complainant's testimony regarding what defendant said to her during the alleged offensive touching was unbelievable. However, the complainant never testified that defendant gave the

beeper number to her, only that he offered to give it to her. Additionally, no testimony was presented to show that defendant knew that complainant's father was in the waiting room or that her father planned to meet complainant at the office. Consequently, there would have been no reason for defendant to warn complainant not to speak of the incident to her father.

Defendant argues that the fact that complainant did not cry out for help, knowing her father was only a few feet away in the waiting room, proves that the offense did not occur. The testimony, however, regarding whether the complainant knew her father was in the waiting room was conflicting. Both the complainant and her father testified that the complainant was to meet her father at defendant's office, that the complainant arrived before her father, and that she was shown into an examining room before he ever arrived. According to the testimony of defendant's wife and her sister, the complainant and her father were together in the waiting room prior to her examination. The court apparently elected to believe the testimony of the complainant and her father, and, given the two women's obvious bias and interest in the case, we do not find this conclusion to be unreasonable. Moreover, even if the complainant had known her father was in the waiting room, we do not believe her failure to "cry out" shows she invented the offense. It may be the complainant was frightened by the strange conduct of a doctor whom she had trusted in the past and that fear and embarrassment as well as the fact that she was "on his turf" prevented her from crying out for assistance.

We do not agree with defendant's contention that it cannot be concluded that his purpose for having the complainant assume a position where her buttocks were elevated was for the purpose of sexual arousal. Sexual arousal can be inferred from the circumstances. (*People v. Goebel* (1987), 161 Ill. App. 3d 113, 125.) All of defendant's experts expressed a disbelief that any treatment would need to involve such a posture. This testimony, in addition to the complainant's testimony that while defendant rubbed lotion on her vaginal area he offered to give her his beeper number, stated she could call him for another treatment, and suggested she not tell her mother about the treatment, give rise to only one conclusion for asking the complainant to assume such a position, *i.e.*, for his sexual arousal.

Defendant's argument here, that the complainant got together with her friend M.H. to concoct the charge against defendant because of the complainant's concern regarding defendant accusing her and her friends of damaging his car, is not credible. According to the complainant, defendant mentioned during the examination that someone had damaged his car and that defendant used some crude language when he re-

ferred to the incident. Nevertheless, no testimony was presented by the complainant or any other witness that defendant had accused the complainant or her friends of the damage. Without such an accusation, it makes little sense that the complainant would concoct a story regarding defendant in retaliation to a nonexistent charge.

The determination of the trier of fact is not to be set aside on review unless it is palpably contrary to the evidence or unless the evidence is so unreasonable, improbable or unsatisfactory as to cause reasonable doubt of the defendant's guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) From our review of the record, we cannot say that the trial court's determination that defendant's conduct did not constitute an accepted medical procedure was palpably contrary to the evidence at trial.

Lastly, defendant argues that the complainant's prior consistent statement was improperly admitted into evidence under the spontaneous utterance exception to the rule against hearsay. To constitute a spontaneous declaration, three factors must be present: (1) an occurrence which is sufficiently startling to produce a spontaneous unreflecting statement; (2) the absence of time to fabricate; and (3) the statement's relationship must relate to the circumstances of the occurrence. (*People v. Potts* (1992), 224 Ill. App. 3d 938, 949.) The admissibility of spontaneous declarations should be determined on a case-by-case basis after considering all relevant factual considerations. (*People v. Hatfield* (1987), 161 Ill. App. 3d 401, 409.) Determining whether a statement was sufficiently spontaneous to qualify for admission in evidence under the spontaneous utterance exception to the hearsay rule is a preliminary question for the trial court. (*People v. Harris* (1985), 134 Ill. App. 3d 705, 711.) The trial court has considerable discretion in determining whether a statement is admissible as a spontaneous declaration, and its decision will not be overturned absent an abuse of discretion. *Potts*, 224 Ill. App. 3d at 949.

Defendant maintains that the statements the complainant made to her friend M.H. were not fairly characterized as "spontaneous" because they were made after the complainant had had ample opportunity to fabricate. Defendant asserts that the failure of the 13-year-old complainant to tell her father about the physical examination by defendant during lunch or during the ride home in the car, along with her demeanor coming out of defendant's office and at the restaurant, indicates she fabricated the charge against defendant. According to defendant, the complainant's testimony that she had "thought" about the examination during lunch and on the ride home shows she had the opportunity to "ruminate regarding her allegations" against defendant.

It is defendant's position here, as in the trial court, that the complainant and M.H. concocted the claim of sexual abuse to ward off any inquiry by defendant into the damage to his car. The complainant had testified that defendant mentioned the alleged vandalism to his car during his examination of her but never accused her or her friends of the damage. Defendant's wife testified that the complainant and M.H. were two of the teenagers she had seen "loitering" in the area behind defendant's office on several occasions prior to the alleged vandalism. Although the complainant acknowledged that on one occasion she and some friends had looked at defendant's sports car, she did not testify that M.H. was among that group of friends. Also, M.H. would later deny ever "hanging around" in the area behind defendant's office. Furthermore, despite Mrs. Ikpoh's testimony regarding observing these two girls behind defendant's office, no evidence was presented to show that defendant had ever accused the complainant and M.H. of causing the damage to his car. Consequently, this would not appear to be a reason for the complainant to fabricate the charge against defendant.

█ The fact that the complainant acknowledged that she thought about the examination during lunch and in the car but did not tell her father about it does not establish that she concocted the charge of sexual abuse. Rather, it could equally have shown that this adolescent girl was thinking about how and whether to tell her father about the incident. The complainant testified that she was reluctant to tell her father what happened because of his stress-related heart problems.

The fact that approximately an hour transpired between the time the complainant left defendant's office and the time she related the incident to her friend M.H. does not establish that her statements to M.H. were not spontaneous. Although elapsed time is material in determining spontaneity, it is not controlling, and a court must decide from the entirety of the surrounding circumstances whether there was an opportunity for reflection and invention. (*People v. Merideth* (1987), 152 Ill. App. 3d 304, 316.) One circumstance to be considered is the declarant's mental state at the time of the statement. (152 Ill. App. 3d at 316.) Other factors to be considered include the nature of the incident, the influence of intervening occurrences, and the presence or absence of self-interest. 152 Ill. App. 3d at 304.

Here, the testimony showed that when complainant exited the examining room to the waiting area, her father greeted her. Complainant did not smile at him and did not participate in any of the conversation her father had with defendant although she was standing near them. Complainant did not complain in any manner, but, at the time, there were other people present in the waiting room. When complain-

ant and her father went for lunch immediately after leaving defendant's office, complainant was "extremely subdued, very quiet." "Quieter than normal," according to her father. In the restaurant, other people were seated near the complainant and her father, obviously making it difficult to discuss what had occurred in defendant's office. Even if, however, they had been alone in the restaurant, it would not have been unusual that the complainant did not discuss the offense with her father. Complainant's father testified that he has three daughters and that all of them talk to their mother about "female problems." However, when the complainant's father dropped her off at home following lunch, complainant's mother was not at home but at work.

Immediately upon her arrival home, complainant called her friend and next-door neighbor, M.H., and asked her to come over. M.H. stated that the complainant's voice was "shaky." When M.H. arrived, the complainant related to her what happened in defendant's office. M.H. stated that the complainant was crying and shaking when she told M.H. what had occurred during her examination.

In light of all the surrounding circumstances shown by the evidence the trial court acted within the boundaries of its discretion in admitting the complainant's statements to her friend M.H. as spontaneous declarations. Even without M.H.'s testimony, there was sufficient evidence to support the court's determination of defendant's guilt.

For the foregoing reasons, the judgment of the circuit court of Du Page County finding defendant guilty of aggravated criminal sexual assault is affirmed.

Affirmed.

INGLIS, P.J., and BOWMAN, J., concur.